# United States Court of Appeals
## For the First Circuit

Nos. 03-1865, 03-1866

ALICIA SANCHEZ-LOPEZ; HECTOR SANTIAGO-GONZALEZ; CONJUGAL
PARTNERSHIP SANTIAGO-VELEZ; ELMER SAURI-SANTIAGO; ERIC BONETA-
MARRERO; NELLY COLON-ORTIZ; IVELISSE VELEZ DE SANTIAGO,

Plaintiffs, Appellees,

v.

MARIA FUENTES-PUJOLS; GOVERNMENTAL DEVELOPMENT
BANK FOR PUERTO RICO; ADA DIAZ-RIVERA,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José A. Fusté, U.S. District Judge]

Before
Lynch, Circuit Judge,
Lipez, Circuit Judge,
and Garcia-Gregory,[*] District Judge.

Joan S. Peters, with whom Andrés Guillemard-Noble, Monique
Guillemard-Noble, and Nachman & Guillemard were on brief, for
appellees.
Enrique J. Mendoza Méndez, with whom Mendoza Law Offices was
on brief, for the Governmental Development Bank and the individual
appellants in their official capacities.
Carlos A. Del Valle Cruz, with whom Anabelle Rodriguez and
Ivonne Palerm Cruz were on brief, for the individual appellants in
their personal capacities.

July 15, 2004

---

[*]    Of the District of Puerto Rico, sitting by designation.

**LYNCH**, **Circuit Judge**.  In this political discrimination case from Puerto Rico, six plaintiffs were awarded a jury verdict in the total sum of $646,000, plus reinstatement, costs, and attorneys fees.  We vacate the verdict and remand.

The appeal involves both the First Amendment prohibition on discrimination based on political affiliation, Elrod v. Burns, 427 U.S. 347 (1976), and the Mt. Healthy defense available to government employers, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).  The Supreme Court's decision in Mt. Healthy established that even if a plaintiff can demonstrate that her political affiliation was a substantial factor in the adverse employment action taken against her, there is no constitutional violation if the defendant can show both (i) that it would have taken the same action in any event, and (ii) that it would have taken that action for reasons that are not unconstitutional.  See Mt. Healthy, 429 U.S. at 286-87.  In other words, it is not true that all a plaintiff needs to show in order to win is that political discrimination was a motivating reason for the employment action.  The fact that the constitutionally protected activity played a substantial part in the actual decision to take adverse employment action does not necessarily amount to a constitutional violation.  Id.

The two distinct questions composing the Mt. Healthy defense must be answered before a finder of fact may determine that

-2-

political discrimination was the ultimate "but for" cause of an adverse employment action. In this case, a misapprehension of the Mt. Healthy defense led to an error in the jury form and instructions. There is a sufficient likelihood of jury confusion from those errors that we vacate the judgment for plaintiffs and remand.

**I.**

Puerto Rico has two major political parties that dominate the electoral landscape: the Popular Democratic Party (PDP) and the New Progressive Party (NPP). Control of the government periodically switches between the two parties. Entirely too often, the political party assuming office terminates the employment of public employees who are affiliated with the party going out of power and then fills those vacancies with its own members. By the same token, the outgoing party attempts to secure the continued tenure of its members in public jobs through a variety of devices, such as reclassifying policy-type appointments as career positions or making appointments in violation of Puerto Rico law.

In 1976, the United States Supreme Court held that public employees have a First Amendment right not to lose their jobs because of their political affiliation, unless political affiliation is an appropriate requirement for the effective performance of the position involved. Elrod, 427 U.S. at 372-73; see also Cordero v. de Jesus-Mendez, 867 F.2d 1, 9 (1st Cir. 1989).

-3-

That doctrine has been refined over the years. In Branti v. Finkel, 445 U.S. 507 (1980), for example, the Court held that an employee need not prove that he or she was coerced into changing political affiliation in order to prevail under the First Amendment. Id. at 517. In Rutan v. Republican Party of Ill., 497 U.S. 62 (1990), the Court defined the scope of employment decisions subject to scrutiny to include promotion, transfer, recall, hiring, and firing. Id. at 78. And in O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712 (1996), the Court extended the protections of Elrod and Branti to contractors and regular providers of services to the government. Id. at 726.

In the original political discrimination cases, Branti and Elrod, there were already findings that the employment decisions at issue were made on political patronage grounds. See Branti, 445 U.S. at 510; Elrod, 427 U.S. at 351. The initial issue presented by those cases was whether historic patronage practices violated the First Amendment at all. See Elrod, 427 U.S. at 353-54. The next set of issues concerned whether a plaintiff needed to show that there had been coercion to change political affiliation, see Branti, 445 U.S. at 517, and what types of jobs and job changes (e.g., reappointment) could give rise to claims, see Rutan, 497 U.S. at 68-69. Rutan presented the question whether a First Amendment claim was stated where a governor had imposed an across-the-board hiring freeze but had given his "express permission" for

exceptions to the freeze only for members of his own party, thus denying hiring, promotion, transfer, and recall to applicants who were members of other parties. 497 U.S. at 65-66. A majority of the Court held that a First Amendment claim was indeed stated on those facts. Id. at 78. For present purposes, it is important that Rutan did not involve the uniform application of a neutral employment policy, but rather the selective application of exceptions according to political party affiliation. See id. at 66.

To the best of our knowledge, the Supreme Court has never addressed the question whether a political discrimination claim may be pursued where the new party in power uniformly applies a personnel practice to all employees -- such as by reviewing all personnel actions taken during a certain period to determine whether those actions conformed to local law and undoing them in every case in which there was a violation.

Despite the thirty years since Elrod, administrations in Puerto Rico have continued to take employment actions against public employees because of their political affiliations. With each change in administration -- at both the commonwealth and municipal levels -- the federal district courts in Puerto Rico are flooded with hundreds of political discrimination cases, many of which are appealed. See, e.g., Gomez v. Rivera Rodriguez, 344 F.3d 103 (1st Cir. 2003) (claims by 24 NPP members who were fired from

-5-

municipal jobs after the PDP won the 2000 mayoral election in Gurabo); Acevedo-Garcia v. Vera-Monroig, 351 F.3d 547 (1st Cir. 2003) (claims by 82 NPP members who were fired from municipal jobs after the PDP assumed power following the 1996 mayoral election in Adjuntas); Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97 (1st Cir. 1997) (claims by six PDP members who were fired after the NPP won the 1992 general election); Kauffman v. P.R. Tel. Co., 841 F.2d 1169 (1st Cir. 1988) (claims by ten NPP members who were fired after the PDP won the 1984 general election). The practice is so pervasive that jury awards in cases of political discrimination threaten to bankrupt local governments in Puerto Rico. See Acevedo-Garcia v. Vera-Monroig, 368 F.3d 49, 55 n.7 (1st Cir. 2004) (verdict exceeded town budget). And yet the culture of political discrimination continues.

## II.

The most recent series of political discrimination cases to reach this court arose out of the 2000 general elections, in which the PDP prevailed over the NPP at the commonwealth level. As a result of the 2000 elections, defendant Puerto Rico Government Development Bank (the "Bank") came under the control of the PDP, and the Bank's NPP board members were replaced with PDP board members. Defendant Maria Fuentes-Pujols ("Fuentes") was appointed the new president of the Bank and, according to plaintiffs,

defendant Ada Díaz-Rivera ("Diaz") constructively functioned as the new director of human resources of the Bank.

Under Puerto Rico law, there is a period of time, called the electoral moratorium period ("veda electoral"), during which no "movement[s] of personnel" are to take place absent emergencies. See 3 P.R. Laws Ann. § 1337. The moratorium period comprises the two months preceding and the two months following a general election.[1] Id. The law was enacted "[f]or the purpose of guaranteeing the faithful application of the merit principle in public service during the period before and after elections." Id.

In early 2001, the newly-appointed Fuentes decided to review all personnel actions taken by the former Bank regime between August 1, 2000 (one month prior to the beginning of the electoral moratorium) and the elections in November 2000. For purposes of this opinion, we will simply refer to that period as the "review period." Fuentes hired an outside consulting firm called Applied Management Consulting, Inc. to perform the review, and a consultant named Ana Bonet conducted the audit. A total of twenty-three personnel actions had taken place during the review period, and Bonet's audit determined that all twenty-three were in violation of the Bank's personnel regulations.

---

[1]     In the case of municipalities, the moratorium period extends until the second Monday of January after the general elections. 3 P.R. Laws Ann. § 1337.

The outside audit revealed that the positions of director of human resources and director of information systems, both formerly designated as policy-making positions (i.e., political appointees), had been converted to career positions in violation of the Bank's personnel regulations. Those conversions affected the employment status of plaintiffs Hector Santiago-Gonzalez ("Santiago") and Eric Boneta-Marrero ("Boneta"), who held those respective positions at the time of the conversions. Under the Bank's personnel regulations, the conversion of a position from "policy-making" to "career" cannot happen unless there is either a structural reorganization of the Bank or a significant change in the functions of the position being converted. According to Applied Management's audit report, neither prerequisite was satisfied in this case.

The report also concluded that Santiago's conversion was invalid for additional reasons. First, because Santiago held the position at the time the conversion occurred, it was valid under the regulations only if he had already occupied the position for six months before the date of the change. But Santiago had only occupied the position for five months. Second, the announcement of the position was deficient under the regulations because it listed the position as requiring a master's degree when in fact the position actually called for either a master's or a bachelor's degree. As a result of that deficiency in the announcement, the

conversion was invalid. And because Santiago had never held a career position at the Bank, the determination that the conversion was invalid returned him to a policy-making position from which he could be, and was, terminated by defendants.

The report concluded that Boneta's conversion, too, was invalid for an additional reason. Under the regulations, a conversion may only occur if the incumbent meets the education criteria for the position. When Boneta's position was converted to a career position, he had not yet obtained a bachelor's degree, which was a requirement for holding the position. Boneta, who had held a career position at the Bank before becoming director of information systems, was reinstated to that prior career position once the conversion was determined to be invalid. At trial, defendants said that they removed both Santiago and Boneta from their jobs because of the illegality of their appointments.

Plaintiffs countered that the conversions were not illegal. They claimed that the outgoing administration had commissioned an outside study on the Bank's classification and compensation structure and that the Bank's board of directors had approved the conversions in accordance with the findings of that study in May 2000. Plaintiffs said that both Santiago and Boneta had vacated their positions following the conversions, in accordance with the Bank's regulations, and then had applied for and had been awarded the respective reclassified positions.

According to plaintiffs, the specific requirements cited by defendants -- the six month occupancy requirement and the educational requirement -- only applied to conversions affecting incumbents and thus did not apply to either Santiago or Boneta because they had both vacated their positions.

The Applied Management report commissioned by defendants concluded that the other twenty-one employees were either unlawfully appointed to career positions or excessively compensated in career positions lawfully held.

Among those twenty-one employees was plaintiff Alicia Sanchez-Lopez ("Sanchez"), who held the position of administrative assistant. According to the report, her appointment was in violation of the Bank's regulations because the public announcement for the position had only been posted for eight days, rather than for ten days as required. The length of the posting had been shortened in order to make sure that the position was filled before the electoral moratorium took effect. Sanchez had not previously held a career position at the Bank to which she could be reinstated, so she was fired by the Fuentes regime.

At trial, plaintiffs maintained that there was no illegality in the appointment. They said that there was an urgent need to fill the administrative assistant position prior to the electoral moratorium and that the Bank's president approved the

shortened posting period as an emergency exception, in compliance with the regulations.

The Applied Management audit revealed that plaintiff Nelly Colon-Ortiz ("Colon") was granted a salary that exceeded by almost fifty percent the lawful maximum compensation for her position. Following the audit, the Bank corrected her salary to reflect the maximum compensation allowed for her position.

Plaintiffs argued that Colon's salary was justified by an exception in the regulations that allows for a higher salary to be paid where the employee was already receiving a higher salary or possesses qualifications exceeding those required, or where the position is difficult to fill.

The audit determined that plaintiff Elmer Sauri-Santiago ("Sauri") occupied a policy-making position in January 1999 and that, in December 2000, he had exercised his right to be reinstated to his prior career position as allowed by Puerto Rico law. However, instead of being reinstated to his prior career position, Sauri was assigned to a higher position with higher compensation. As a result, the "reinstatement" effectively amounted to a promotion, and because it was done during the electoral moratorium, it was null and void under Puerto Rico law. Consequently, defendants reinstated Sauri to the position to which he was entitled under the regulation, and his salary was reduced

-11-

accordingly.  Unhappy with his new position, Sauri subsequently resigned.

Plaintiffs argued at trial that under the regulations, Sauri had a right to be reinstated to a position "similar or equal to" his last career position.  They contended that the position to which he was originally reinstated was indeed similar to his previous career position, but the position to which he was reinstated by the Fuentes regime was not similar.

At the time of the audit, the Bank had just over 180 employees, of whom about 80% were NPP members and about 20% were PDP members.  There is no evidence that the review process undertaken by defendants and their outside consultant itself was applied differentially or in a discriminatory manner; all twenty-three personnel actions taken during the review period were audited and corrective action was taken as to all twenty-three employees affected.

Of the twenty-three employees as to whom corrective action was taken, the five described above now claim that the corrective actions that followed the audit were taken against them due to impermissible political discrimination.  The defendants' rejoinder is that this case is an instance of reverse political discrimination where the losing party, the NPP, attempted to embed permanently its employees in public jobs by making appointments and reclassifying positions in violation of local law.  Defendants say

that they took the corrective actions simply because the personnel actions taken during the review period were illegal; they claim that they would have taken the same actions based on such illegality regardless of the party affiliation of the employees affected. They say they were trying to reinforce, not defeat, the merit system. Defendants also argue that two of the plaintiffs, Santiago and Boneta, do not even have First Amendment claims because they only held policy-making positions, for which political affiliation is an appropriate requirement, and the attempts to convert their positions to career positions were null and void.

### III.

The five employees and one of their spouses brought suit in federal court under 42 U.S.C. § 1983, asserting both due process claims and First Amendment political discrimination claims. The suit was brought against the Bank, as well as against Fuentes and Diaz in both their official and individual capacities. The suit against the two individuals in their official capacities is in reality a suit against the Bank. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003). Fuentes and Diaz in their individual capacities were represented by separate counsel.

The district court dismissed all of plaintiffs' due process claims on summary judgment. The court held that even if plaintiffs did have a property interest in their jobs (and thus could satisfy the first prong of the due process test), they

-13-

nevertheless had not shown that adequate post-deprivation remedies were unavailable to them (and thus could not satisfy the second prong of the due process test).

As to the First Amendment claims, the district court denied defendants' motion for summary judgment on the ground that defendants' evidence did not compel the conclusion that political discrimination was not the "but for" cause of the personnel actions. Jirau-Bernal v. Agrait, 37 F.3d 1, 4 (1st Cir. 1994).

Defendants argue to us, quite erroneously, that the district court necessarily must have found that the personnel actions taken during the review period were null and void under local law in order to enter judgment on the due process claims. But the district court was clear that it considered there to be a material dispute of fact as to whether the appointments were null and void under Puerto Rico law and that it need not resolve that dispute in order to rule on the summary judgment motion. Plaintiffs have not cross-appealed the dismissal of their due process claims.

Defendant Fuentes, the president of the Bank, also filed a motion for summary judgment, claiming that she was entitled to qualified immunity. Inexplicably, the motion did not include defendant Diaz. The district court denied the motion, finding that there were several disputed issues of fact.

This left the First Amendment claims to be tried to a jury. At the trial, which lasted seven days, defendants' position was that the personnel actions taken during the review period were null and void under local law and that this had two consequences: first, it meant that there was insufficient evidence that political discrimination was a contributing cause to the corrective actions taken by the new regime, and second, it meant that even if political discrimination were a motivating factor, defendants would have authorized the audit in any event and uniformly corrected the irregular appointments under Puerto Rico law. The second argument is the Mt. Healthy defense. 429 U.S. at 285-87.

At the close of the evidence, Fuentes moved to renew her claim for qualified immunity, which was again denied.[2] The case was submitted to the jury, which returned a verdict against defendants on March 18, 2003. The jury awarded compensatory damages to plaintiffs as follows: $321,000 to Santiago, $90,000 to Sauri, $50,000 to Colon, $85,000 to Boneta, $70,000 to Sanchez, and $10,000 to Ivelisse Velez de Santiago (Santiago's wife). The jury also assessed punitive damages against Fuentes in the amount of $2,500 for each employee-plaintiff (a total of $12,500) and against Diaz in the amount of $1,500 for each employee-plaintiff (a total of $7,500).

---

[2] Fuentes thereafter made no motion under Fed. R. Civ. P. 50(b) for entry of judgment on qualified immunity.

The court required plaintiffs to indicate by March 26, 2003 which of them would seek injunctive relief (i.e., reinstatement). On March 20, defendants moved to be heard fully on reinstatement, pointing out that they needed to know who was seeking reinstatement and on what grounds. On Tuesday, March 25, the plaintiffs filed their motion for reinstatement, but their motion was not received by defendants until March 29, a Saturday. On Tuesday, April 1, defendants filed their opposition to reinstatement. It was too late: on Monday, March 31, the district court, without hearing from defendants, had issued the judgment, which included an order allowing the reinstatement of all five employee-plaintiffs.

Defendants moved on April 10 to alter or amend the judgment to deny reinstatement, arguing that they had not been heard on that issue. On May 5, the court denied the motion without comment. Also on May 5, the court denied defendants' motion for a new trial and motion for judgment as a matter of law.

**IV.**

The Bank, together with Fuentes and Diaz in their official capacities, appeals from the jury verdict and also challenges the reinstatement of three of the plaintiffs (Santiago, Boneta, and Sauri). Fuentes and Diaz in their individual capacities appeal from the denial of qualified immunity.

-16-

Before addressing defendants' specific claims on appeal, we describe the Mt. Healthy defense.

A. The Mt. Healthy Defense

Although Mt. Healthy was a freedom of speech case, it is routinely applied to political discrimination cases of the Elrod/Branti/Rutan variety. Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000). In the aftermath of Mt. Healthy, confusion still sometimes arises about the issue of causation.

On top of several subsidiary layers of causation, there is an ultimate constitutional question of "but for" causation. See Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 417 (1979) (referring to "but for" causation); Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993). As the Supreme Court clarified in Crawford-El v. Britton, 523 U.S. 574 (1998),

> [A]t least with certain types of claims, proof of an improper motive is not sufficient to establish a constitutional violation -- there must also be evidence of causation. Accordingly, when a public employee shows that protected [conduct] was a "motivating factor" in an adverse employment decision, the employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct.

Id. at 593 (emphasis added). Thus, even if a plaintiff meets his or her initial burden of showing that political affiliation was a motivating factor for an employment decision, that is insufficient to establish discrimination as a matter of law because the plaintiff's case at that point does not "distinguish[] between a result caused by a constitutional violation and one not so caused."

-17-

<u>Mt. Healthy</u>, 429 U.S. at 286. As the Supreme Court noted, to adopt a view of causation that focuses solely on whether protected conduct played a part in an employment decision -- the view that plaintiffs argued here -- would put an "employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied [otherwise]." <u>Id.</u> at 285.

To give an example, a plaintiff's political affiliation may have been an employer's motivating reason for terminating the plaintiff. Nevertheless, the employer may still defeat liability for that termination by meeting its dual burden under <u>Mt. Healthy</u> -- by proving, for example, that the plaintiff had been caught stealing from the employer and that the employer fires every employee who steals from it. Carrying that line of argument to this case, defendants here were entitled to defeat liability by showing that plaintiffs' positions were obtained in violation of Puerto Rico law and that, even if political animus was a factor, defendants would have taken corrective action anyway against every employee whose position was obtained in violation of law.[3] If there is no dispute that the positions were obtained in violation of Puerto Rico law, then the only question left is whether

---

[3] The illegality-of-appointment argument was the primary component of defendants' <u>Mt. Healthy</u> defense. Defendants also raised a cost-cutting justification for the corrective actions, but that justification is severely undercut by their prompt hiring, it appears, of members of their own party to fill the positions vacated as a result of the corrective actions.

-18-

defendants would have fired all employees holding such positions in any event. If defendants demonstrated that they in fact have a practice of taking corrective action against all employees in such positions, or could otherwise show that they would have taken the corrective action anyway, then they were entitled to prevail.

There are obvious difficulties with this model, which the Supreme Court may one day address. The first is that when an employer asserts a Mt. Healthy defense in a political discrimination case, the trier of fact (absent a prior determination under state law) essentially becomes a kind of super-personnel board making determinations about whether particular personnel actions violated state or local personnel laws. There is no evidence here that plaintiffs, if they had any administrative appeal rights under Puerto Rico law, ever exercised them, though each of the employee plaintiffs received a pre-termination hearing. It would be different if this were a case in which a duly authorized agency determination had been made of the legality of the personnel actions under local law. The second difficulty concerns whether the Supreme Court would in the end, once the illegality of the personnel action to be corrected had been established under local law, require an employer who had shown a consistently applied practice of remedying all such illegal appointments to show anything more.

-19-

Defendants argue that the law has recently shifted in their favor. They lean heavily on the Supreme Court's decision in Texas v. Lesage, 528 U.S. 18 (1999), which they argue requires only that they show that plaintiffs' appointments were in violation of law. They view Lesage as excusing them from meeting their burden under Mt. Healthy of showing that they would have acted to remove plaintiffs based on the illegality of their appointments in any event.

Lesage is important, but it does not carry defendants as far as they would have it take them. Lesage involved a challenge to a university's affirmative action policy by an applicant for admission who, it was undisputed, would not have met the university's admission criteria even if the university had not applied its challenged affirmative action criteria. 528 U.S. at 19. The Court held that the applicant alleged no cognizable injury. Id. at 22. Lesage has been most commonly applied in similar "applicant" situations and is sometimes interpreted as holding that an applicant lacks Article III standing to sue for damages if she cannot show that she would have benefitted in the absence of the challenged government conduct. See Cotter v. City of Boston, 323 F.3d 160, 166-67 (1st Cir. 2003); Donahue v. City of Boston, 304 F.3d 110, 116-17 (1st Cir. 2002).

Importantly, in Lesage it was undisputed that the plaintiff did not otherwise meet the admission criteria. See

-20-

Lesage, 528 U.S. at 21. In cases such as this one, by contrast, plaintiffs frequently dispute whether there were any irregularities in their appointments and, even if there were, whether those irregularities would have led to their removal were it not for the employer's alleged bad motive. Defendants' argument is that Lesage has sub silentio overruled the second prong of Mt. Healthy. We think not. The Supreme Court was explicit about the limits of its holding in Lesage: "Simply put, where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." Id. at 21 (emphasis added).[4]

Our cases have often presented situations in which defendants have not uniformly applied a neutral basis, such as illegality of appointment, for taking employment actions, but rather have taken action against members of the opposing party but not against similarly situated members of defendants' own party. See, e.g., Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 10-11 (1st Cir. 2000) (discriminatory application of an otherwise lawful layoff plan). By contrast, we have also affirmed entry of summary judgment for defendants in situations where plaintiffs had no evidence of differential treatment in the personnel actions taken

---

[4] Even if there were tension between the two cases, we are bound by Mt. Healthy, which has not been overruled.

-21-

against those who were illegally appointed.  See, e.g., Kauffman, 841 F.2d at 1172-73.  And we have allowed for a possible claim of discrimination where, in the guise of restructuring, defendants eliminated only one job, but not others.  Padilla-Garcia, 212 F.3d at 78.  Those holdings are consistent with the notion that simply showing that an appointment was illegal under local law does not suffice to meet defendants' Mt. Healthy burden.

B.  Jury Instruction and Jury Form Issues

Two of defendants' arguments on appeal involve the district court's refusal to give certain jury instructions.  Our examination of jury instructions focuses on "whether they adequately explained the law or whether they tended to confuse or mislead the jury on controlling issues."  Federico v. Order of Saint Benedict, 64 F.3d 1, 4 (1st Cir. 1995); Brown v. Trs. of Boston Univ., 891 F.2d 337, 353 (1st Cir. 1989).  A properly preserved objection to the failure to give a requested jury instruction is reviewed de novo, Gray v. Genlyte Group, Inc., 289 F.3d 128, 133 (1st Cir. 2002), and such a refusal constitutes reversible error only if it was prejudicial in light of the entire record, Tum v. Barber Foods, Inc., 360 F.3d 274, 282 (1st Cir. 2004); see also Sheek v. Asia Badger, Inc., 235 F.3d 687, 697 (1st Cir. 2000).  A court's choice of language in jury instructions, by comparison, is reviewed only for abuse of discretion.  Gray, 289 F.3d at 133.

-22-

1.  Kauffman Instruction

Defendants' initial argument is that the district court erred in refusing to give their requested instruction based on Kauffman v. Puerto Rico Telephone Co., 841 F.2d 1169 (1st Cir. 1988). Kauffman was a case alleging political terminations in violation of both the First Amendment and due process rights. Here, defendants requested an instruction under Kauffman to the effect that a public employee's expectations of permanent employment as a result of holding a position for a period of time have no bearing on the illegality of his or her appointment and thus that an appointment made in violation of the regulations is necessarily null and void. The record reflects the following exchange:

> [COUNSEL FOR DEFENDANTS]: Your Honor, in the case of Kauffman -- Kauffman vs. Puerto Rico Telephone, and I argued it is clear that an employee ignores the fact that his employment might be null and void, that doesn't go to the issue of nullity, and neither having occupied the position for some time period. It is an expectation to be kept in the position.

> THE COURT: I think that the principles that I instructed the jury on are consistent with the case that is tried.

While the language referenced in the proposed instruction derives from the due process section of analysis in Kauffman, 841 F.2d at 1173 ("[U]nder Puerto Rico law any property right associated with a career position is rendered null and void if a violation of the

Personnel Act attends the filling of such a position."), portions of it are also applicable to a First Amendment Mt. Healthy defense.

The defense was entitled to an instruction that illegality of appointment was a neutral reason for corrective action, whatever the employee's subjective expectation. But the requested instruction went beyond that to suggest that a mere showing of illegality of appointment sufficed to meet their defense. Defendants overreached.

## 2. Policy-making Position Instruction

Defendants equate the term "trust position" ("puesto de confianza") with "policy-making position" and use the term to signify a position for which political affiliation is an appropriate requirement. For purposes of this opinion, we refer to such a position as a "policy-making position." A new government in power can replace employees in such positions without violating the First Amendment. See Branti, 445 U.S. at 517.

One of the Bank's defenses was that two of the plaintiffs had been in such policy-making positions until the former administration changed those positions to career positions ("puesto de carrera") in violation of local law. Defendants argued that because the change had been illegal, the two plaintiffs affected (Santiago and Boneta) should have been considered as holding only such policy-making positions, from which they could be removed without any First Amendment issue.

-24-

Defendants introduced evidence to this effect and requested a jury instruction that a First Amendment claim is not stated as to positions for which political affiliation is an appropriate requirement.  The requested instruction was rejected, and defendants properly preserved their objection.  See Fed. R. Civ. P. 51; Connelly v. Hyundai Motor Co., 351 F.3d 535, 544 (1st Cir. 2003).  In rejecting the instruction as irrelevant, the district court said:

> Those positions were career positions.  Whether it was advisable or wise to convert them is a different story, but they were converted to career.
>
> When you took the adverse employment action, they were career positions, and we have to start from that.

This reasoning was error in light of defendants' Mt. Healthy defense.  The theory of defendants' case was that these formerly policy-making positions had been illegally converted into career positions, that the illegality of the conversions, in turn, meant that the positions remained only policy-making positions, and thus that no violation of the First Amendment had occurred.

We consider the question of prejudice in light of defendants' claims of cumulative error.

3.  Deficient Jury Form

Despite the fact that defendants asserted a Mt. Healthy defense and the court provided an instruction on that defense, the jury verdict form did not reflect the law under Mt. Healthy.

-25-

Instead, the form asked only the following questions as to liability with respect to each plaintiff:

Do you find from a preponderance of the evidence:

1. That the Plaintiff engaged in constitutionally-protected political activity, a form of free speech, as defined in this court's instructions?

. . . .

2. That such protected political activity by the Plaintiff was a substantial or motivating factor in the Defendants' decision to politically discriminate against the Plaintiff?

. . . .

3. That the Defendants' acts were the proximate or legal cause of damages sustained by Plaintiff?

. . . .

6. [As to Fuentes and Diaz,] [t]hat the Defendants acted with malice or with reckless indifference to the Plaintiff's federally-protected rights . . . .

a. <u>Standard of Review</u>

"A verdict form must be reasonably capable of an interpretation that would allow the jury to address all factual issues essential to the judgment." <u>Sheek</u>, 235 F.3d at 699 (internal quotation marks omitted). To determine whether the issues were fairly presented to the jury, we examine the court's instructions and the wording of the verdict form as a whole. <u>Id.</u>; <u>Johnson</u> v. <u>Teamsters Local 559</u>, 102 F.3d 21, 28 (1st Cir. 1996). We review the court's instructions de novo, unless the objection to the instructions was not preserved, in which case our review is for

-26-

plain error only.  Gray, 289 F.3d at 133; see Reynolds v. Green, 184 F.3d 589, 594 (6th Cir. 1999).

There is a threshold issue of whether defendants waived their objection to the jury form.  Defense counsel represented to us at oral argument that he saw the verdict form for the first time when it was read and explained to the jurors at the end of the charge.  Plaintiffs do not dispute that.[5]  Defendants immediately objected to the form on the ground that it did not include a question about the Mt. Healthy defense -- about whether defendants would have taken the challenged personnel actions anyway because the appointments violated Puerto Rico law.  The district court rejected defendants' objection and stated that the instructions on the affirmative defense had been repeated at least three times in the charge and that those instructions were very clear.  The court also stated that the second question on the jury form addressed defendants' concern because it required a finding that plaintiffs' political activity was a substantial or motivating factor.  For reasons described earlier, this explanation was insufficient.

Where a Mt. Healthy defense has been presented we suggest that, to the extent it may not be a common practice, district courts use a verdict form that has at least one question explicitly

---

[5]     There is no mention of the verdict form in the trial transcript before the district court's instructions to the jury, and the record does not indicate the point at which the form was given to the parties.

addressed to that defense.  We also suggest that proposed verdict forms always be shared with counsel and discussed together with the proposed jury instructions before the jury charge and explanation of the verdict form in open court.  Here, the deficiency in the form could have been avoided altogether had the district court followed these suggested procedures.

Defendants had an opportunity to provide a draft jury form to the district court, which they did not take.  They also had the opportunity to request that the district court provide them with a copy of the form in advance of its explanation to the jury; again, they did not request it.  By the same token (and taking defendants' representation as accurate), it would have been better practice for the district court to review the form with counsel before explaining it to the jurors.[6]

When the district court told defense counsel that it was disinclined to substitute a new form or question, defendants could and should have requested supplemental jury instructions addressed to any possible jury confusion.  For example, defendants could have requested that the jury be instructed that even if it found that political discrimination was a motivating factor, it could not on

---

[6]    Once the form was read to the jurors, the district court was caught in a bit of a dilemma.  The withdrawal of the form and substitution of a new form or belated addition of a new question to the form may have raised the risk of unduly emphasizing the Mt. Healthy defense.  The district court did not, though, express that concern, and instead refused to alter the form on the ground that doing so was unnecessary.

that basis alone award damages without first addressing the <u>Mt. Healthy</u> defense. The jury could have been instructed that if it found that the corrective actions would have been taken against plaintiffs in any event, then under <u>Mt. Healthy</u>, it could not go on to damages. Defendants did not request any such instructions. It is reasonable to infer, however, from the colloquy between court and counsel in the record, that the district court would have rejected such a request.

In light of the peculiar circumstances giving rise to the deficiency in the form, this case does not fit neatly into the usual doctrine of waiver. So we proceed to ask, on this record, whether there was a realistic prospect of jury confusion on the <u>Mt. Healthy</u> issue.

b. <u>Analysis of Potential Confusion Caused by the Form</u>

In response to defense counsel's protestation about the jury form, the court stated, erroneously in our view, that to answer the second verdict form question "yes," the jury would need to have rejected the <u>Mt. Healthy</u> defense. We repeat the court's instructions on the second verdict form question:

> Second, do you find from a preponderance of the evidence that such protected political activity by the plaintiff was a substantial or motivating factor in the defendants' decision to politically discriminate against the plaintiff?

For the reasons that follow, we agree with defendants that the form was not adequate and that it had the potential to mislead the jury.

We start with this observation: defendants' illegality-of-appointment argument was far from frivolous. Defendants were able to point to specific alleged violations of Bank regulations for the personnel actions taken during the review period as to each of the employee plaintiffs. But it is also true that some of the alleged violations could have been seen by the jury as involving technical niceties that might normally have been overlooked. Yet other alleged violations were clearly more serious -- for example, the conversions of the two positions from policy-making status to career status when, allegedly, there was neither a change in the nature of the positions nor in the Bank's structure that would have justified the conversions.

The theme of plaintiffs' opening statement was that the real motivation for the personnel actions that were taken against the employee plaintiffs was that they were NPP members and that defendants' stated reasons for the actions were untrue and trivial.

The theme of the opening statement for the Bank and the two individuals in their official capacities was that they had followed the rules and regulations of Puerto Rico law without exception and that the personnel actions that the former NPP regime had taken as to each of the plaintiffs were unlawful. The theme of the opening statement for Fuentes and Diaz in their individual capacities was that plaintiffs "were dismissed or changed from their positions because they were illegally appointed to those

positions, and they did not comply with the law." Indeed, the argument was that it was plaintiffs' party, the NPP, that had discriminated -- that no one from the PDP party had been assigned to any positions by the prior administration during the moratorium period. But if a PDP party member had been unlawfully appointed during the review period, the defense argued, then the new administration would have taken corrective action against that person due to the violation of Puerto Rico law.

In his closing argument, plaintiffs' counsel told the jury that they would be instructed by the court that even if plaintiffs

> had been wrongly appointed and wrongly transferred, if it was motivated by politics, you have to find for plaintiffs. In other words, it wouldn't even matter if, as they claimed, these plaintiffs had been fired . . . because the prior appointment had been wrong. Even if that was so, if you decide that politics was a motivating factor, you must find for plaintiffs.

As that portion of the closing demonstrates, plaintiffs' case was tried on a theory of causation directly in conflict with Mt. Healthy. Their theory was that even if defendants would have taken the disputed actions anyway because the plaintiffs' appointments violated Puerto Rico law, that fact was irrelevant if political discrimination was a motivating factor in the decision. This argument fundamentally misunderstands Mt. Healthy.[7]

_____

[7] By the same token, defendants argued to the district judge a theory, described earlier, that also fundamentally misunderstands Mt. Healthy as being overruled by Lesage.

-31-

The court correctly instructed the jury that plaintiffs first had to show that their protected political activity was a substantial or motivating factor for the disputed personnel actions. The court also instructed the jury that the burden then shifted to defendants to show that they would have made the same decisions based on "some other reason . . . standing alone and in the absence of political discrimination."[8] This second instruction

---

[8] The jury instructions were a slight variation on standard recommended instructions:

> If you find that the plaintiff's protected speech (<u>or</u> act of expression) was a substantial or motivating factor in the defendant's decision to take action against the plaintiff, you must consider whether the defendant has presented an adequate defense to the plaintiff's case.
> The defendant presents an adequate defense to the plaintiff's case if the defendant can show, by a preponderance of the evidence, that it would have reached the same decision to take action against the plaintiff even in the absence of the plaintiff's protected speech. In other words, the defendant must show by a preponderance of the evidence that it would have made the same decision without considering the plaintiff's protected speech.
> If the defendant shows by a preponderance of the evidence that it would have reached the same decision without considering the plaintiff's protected speech, then you must find in favor of the defendant.
> It is important for you to realize that the defendant has not presented an adequate defense if it shows merely that it had other, valid reasons for taking action against the plaintiff. It is a defense only if the defendant would have acted on those other reasons in the absence of the plaintiff's protected speech. Therefore, if the defendant offers other, valid reasons for taking action against the plaintiff, the defendant must further show that it would have acted on those reasons. Otherwise, it has not presented an adequate defense.

was at odds with the jury form, which did not provide any question addressed to whether defendants had carried their burden. And although not technically incorrect by itself, that second instruction became susceptible to an incorrect interpretation by the jury when considered in conjunction with the jury form.

Because there was no question on the jury form about whether defendants had carried their two part burden under Mt. Healthy, the jurors might have thought that if they answered the first two question on the form "yes" -- i.e., that there was protected political activity and that it was a substantial or motivating factor in defendants' decisions -- then those findings alone could or even must lead to an affirmative finding on question three -- that defendants' "acts were the proximate or legal cause of damages sustained by Plaintiff" -- and thus that the affirmative defense was irrelevant. That understanding of the form was consistent with a plausible, though incorrect, interpretation of the court's instruction that defendants had to show that they would have taken the same actions "in the absence of political discrimination." Considered in conjunction with the absence of guidance about the Mt. Healthy defense on the jury form, it becomes apparent that the jurors could have understood that language as suggesting that defendants had to prove that there was an "absence

_____

5 L. Sand et al., Modern Federal Jury Instructions 87-284 (Matthew Bender 2000).

of political discrimination" before they could take advantage of the affirmative defense and show that they would have acted the same way for a different reason.

The possibility that the jurors might have misinterpreted the instructions in this way is bolstered by the fact that plaintiffs' counsel himself misunderstood the law in precisely that way and characterized it as such in his closing argument. Plaintiffs' counsel erroneously told the jury that "it wouldn't even matter if, as [defendants] claimed, these plaintiffs had been fired . . . , because the prior appointment had been wrong. Even if this was so, if you find that politics was a motivating factor, you must find for plaintiffs."

Had the court's instruction been accompanied by a separate Mt. Healthy question on the jury form, the potential confusion most likely would have been avoided. But the court rejected defendants' objection to the form, on the ground that the second question required that the jury find that the plaintiffs' political activity was "a substantial or motivating factor." The court added that the jury would need to have rejected the Mt. Healthy defense in order to answer "yes" to that question. For the reasons explained earlier, an affirmative answer to that second question did not eliminate the need to go on to ask whether, even if defendants were politically motivated as to these actions, they would nevertheless have taken the same actions based on the

-34-

illegality of the appointments. The court did, in fact, tell the jury in a short instruction during the charge that even if it answered the second question "yes," it still needed to go on to the third question, which asked whether "Defendants' acts were the proximate or legal cause of damages sustained by Plaintiff[s]," and that it could answer that question "yes" or "no." At least arguably, that third question embraced Mt. Healthy causation and implicated defendants' burden. But if the court did indeed understand the question in that way, then that interpretation simply cannot be reconciled with the court's comment to defense counsel about the meaning of the second question. And in any case, we cannot say with any assurance that the third question and the applicable instruction adequately corrected for the significant jury confusion that could have arisen from the misstatements and omissions described above.

Moreover, the wording of the second verdict form question was not precise, and that lack of precision might have affected the jurors' understanding of the interplay between verdict form questions two and three. The second question asked whether plaintiffs' political activity was a substantial or motivating factor "in the defendants' decision to politically discriminate against the plaintiff[s]" (emphasis added). It did not more precisely say "in the defendants' decision to take adverse employment action against the plaintiff[s]." The wording of the

-35-

question thus assumed a conclusion that was meant for the jury, and accordingly, could have contributed to juror confusion about whether defendants could meet their burden once there had been a finding of any political motivation.

If the evidence were very clearly in plaintiffs' favor that the Mt. Healthy defense failed, that might influence our assessment of the risk that the jury was misled. But our reading of the record is that defendants presented a very strong Mt. Healthy defense. Each of the defense witnesses reinforced the defense position that the personnel actions taken by the NPP regime during the review period were unlawful and that the Fuentes regime uniformly and fairly took corrective actions in accordance with the outside report from Applied Management.

Ana Bonet, who was primarily responsible for conducting the Applied Management audit, testified that she had extensive experience in Puerto Rico personnel services and explained that she had done similar audit work for about three other Puerto Rico agencies after the elections. She described in great detail the irregularities associated with the personnel actions taken as to each of the five plaintiffs during the review period, and she described in more general terms the irregularities associated with the personnel actions taken as to eighteen other employees during the review period. Bonet also testified about how her task was presented to her. She explained that she "was told that [Fuentes

-36-

and the executive committee] only wanted to verify whether [the twenty-three personnel actions during the review period] were correct. And if they were correct, everything was fine. And, if not, [Fuentes and the committee] would have to correct it." That description of the presentation supported the defense theory that the Fuentes regime applied the audit in a neutral way and would have taken corrective action regardless of political affiliation.

The jury also heard from Fuentes, the president of the Bank. She testified in detail about her decision to conduct the audit. Upon assuming the position, she explained, she learned that personnel salaries accounted for one of the Bank's highest expenses. As a result, she decided, in conjunction with the executive committee, that the Bank should verify whether its personnel actions were legitimate and hired Applied Management for that purpose. Legal counsel advised her and the committee that the best way to start the review process was to begin with the period of time closest to the electoral moratorium. Fuentes testified that she and the committee adhered strictly to the determinations in the outside report and did not involve themselves in the process of analyzing the legality of the personnel actions. They followed Bonet's recommendations, and as to the group of personnel actions involving irregularities in reinstatement, also consulted the Puerto Rico Department of Justice for an opinion.

Another defense witness, Aixa Diaz Montijo, who was the vice president of operations and supervised the Bank's division of human resources, testified that Applied Management was hired "to conduct [the audit] process as objectively as possible." Her testimony also made it clear that every one of the personnel actions taken during the review period were analyzed as part of the audit.

To be sure, plaintiffs contested the illegality of the personnel actions taken during the review period and suggested that political discrimination was the motivating factor for the actions taken by the Fuentes regime. But the point here is simply that the affirmative defense was clearly viable given the testimony and thus that the existence of jury confusion as to the Mt. Healthy defense was not at all beside the point.

C. Assessment of Prejudice

The combination of the failure to give the policy-making-position instruction and the failure of the jury verdict form to ask a distinct Mt. Healthy question is fatal to plaintiffs' verdict. We are not convinced that the jurors necessarily and implicitly concluded by their verdict that defendants had failed to establish a Mt. Healthy defense and that political discrimination was the "but for" cause of defendants' actions. We cannot say that we are confident that the jury properly understood the task before it, especially in light of the deficient verdict form.

-38-

**V.**

Defendants have asked that we reverse the verdict or send the case back for a new trial. If we were confident that no rational, properly instructed jury could conclude anything other than that defendants had established their Mt. Healthy defense, then defendants would have a strong argument for entry of judgment in their favor. But we cannot reach that conclusion. Plaintiffs disputed defendants' claim that their appointments were in violation of Puerto Rico law, so there was a material dispute about whether defendants even had a neutral reason for the corrective actions taken.

If, on remand, defendants can persuade a factfinder that they did indeed have neutral reasons for the personnel actions, then they will still need to satisfy the second prong of the Mt. Healthy defense. As to that prong, defendants argue that the evidence shows that they reviewed all appointments made during the review period and that they took corrective action against all employees whose appointments had any defect during that period. If defendants in fact would have adopted a policy of remedying all illegality during the review period regardless of the political affiliation of the affected personnel, and then uniformly applied that policy, they will be entitled to prevail.

Plaintiffs rely on the fact that all of the employees affected by defendants' actions were NPP members. That argument

-39-

misunderstands the law under the Elrod/Branti line of cases.  While a jury might consider this impact as evidence that defendants would not have taken the same action anyway, there is simply not a claim of "disparate impact" available under this First Amendment doctrine.  If uniformly applied personnel practices, predicated on legitimate reasons, result in terminations, those terminations are not unconstitutional because those affiliated with one political party are disproportionately impacted.  It is in the nature of a change in administrations that job actions by the new party in power will have a disparate impact on members of the outgoing party.

Nor does the fact that the new regime focused on a period of time closely tracking the electoral moratorium period necessarily help plaintiffs, as they contend.  The selection of that period for review here was perfectly rational -- Puerto Rico law itself recognizes the electoral moratorium period as the period of greatest risk of disregard for normal personnel practices.  See 3 P.R. Laws Ann. § 1337.

The jury verdict is **vacated**.  The denial of qualified immunity and the reinstatement order are also **vacated**.  The case is remanded for proceedings consistent with this opinion.

So ordered.  No costs are awarded.

-40-