# United States Court of Appeals
## For the First Circuit

No. 04-1217

JUSTIN LEE WHITFIELD; TERRY WHITFIELD; GAIL WHITFIELD,

Plaintiffs, Appellees,

v.

ANIBAL MELÉNDEZ-RIVERA; ISMAEL ÁLVAREZ-MONGE;
MARIA L. LEBRÓN-RAMOS,

Defendants, Appellants,

MUNICIPALITY OF FAJARDO; WILLIAM MANGOMÉ-ROLDÁN

Defendants.

No. 04-1218

JUSTIN LEE WHITFIELD; TERRY WHITFIELD; GAIL WHITFIELD,

Plaintiffs, Appellees,

v.

MUNICIPALITY OF FAJARDO

Defendant, Appellant,

ANIBAL MELÉNDEZ-RIVERA; ISMAEL ÁLVAREZ-MONGE;
MARIA L. LEBRÓN-RAMOS; WILLIAM MANGOMÉ-ROLDÁN

Defendants.

No. 04-1219


JUSTIN LEE WHITFIELD; TERRY WHITFIELD; GAIL WHITFIELD,

Plaintiffs, Appellees,

v.

MUNICIPALITY OF FAJARDO; ANIBAL MELÉNDEZ-RIVERA;
ISMAEL ÁLVAREZ-MONGE; MARIA L. LEBRÓN-RAMOS

Defendants,

WILLIAM MANGOMÉ-ROLDÁN,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

---

Before
Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

---

Gael Mahony with whom Stephen S. Young, Holland & Knight, LLP,
Etienne Totti Del Toro, and Totti & Rodriguez Diaz, were on brief,
for appellant, Municipality of Fajardo.
Eileen Landron Guardiola, with whom William Vázquez Irizarry,
Secretary of Justice, Ivonne Palerm, Deputy Secretary of Justice In
Charge of Litigation, Eduardo Vera Ramírez and Landrón & Vera, LLP,
were on brief, for appellants, Anibal Meléndez-Rivera, Ismael
Álvarez-Monge and Maria L. Lebrón-Ramos.
Tessie M. Leal-Garabis, with whom Gary H. Montilla, and
Quiñones & Sánchez, P.S.C., were on brief, for appellant, William
Mangomé-Roldán.
John F. Nevares with whom John F. Nevares and Associates
P.S.C., Camilo K. Salas III, Karen M. Fontana, and Niles, Salas,
Bourque & Fontana, L.C., were on brief for appellees.

---

December 6, 2005

---

**HOWARD**, **Circuit Judge**.  Justin Whitfield was shot twice in the left leg by two municipal police officers as he retreated from the scene of an apparent arson at a parking garage in Fajardo, Puerto Rico.  Alleging that the officers had employed excessive force, and that the mayor and the police commissioner of the city had failed to adopt and implement regulations and training programs instructing local police on the proper use of deadly force, Whitfield and his parents brought suit under, inter alia, 42 U.S.C. § 1983.  Whitfield additionally brought suit against the city, seeking to hold it liable under a Monell theory.  See Monell v. Dep't of Social Services, 436 U.S. 658 (1978).  The defendants now appeal the jury verdict and the over $5 million dollar compensatory and punitive damage awards.  We affirm in part, reverse in part, and remand.

**I.**

We state the facts in the light most favorable to the jury verdict.  See Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 45 (1st Cir. 2005).  In the pre-dawn hours of December 9, 2000, Justin Whitfield, an active duty serviceman in the United States Navy stationed in Puerto Rico, gave a ride to a friend and fellow Navy enlistee, John Kawika.  Under the pretense of showing Whitfield some antique cars, Kawika instructed Whitfield to drive to a municipal parking garage in downtown Fajardo.  Once they arrived, Kawika told Whitfield he intended to light a car on fire.  Kawika

-3-

proceeded to climb the exterior wall of the garage and Whitfield followed. As Whitfield looked on, Kawika set fire to a convertible on the third level of the garage.

Two patrolling Fajardo police officers, Officer William Mangomé-Roldán, and his immediate superior, Sergeant Maria Lebrón-Ramos, observed Kawika and Whitfield scaling the exterior garage wall. The officers entered the building to investigate. Upon reaching the third level, Mangomé and Lebrón found three cars on fire. The officers saw two people at the far end of the garage and ordered them to stop. Ignoring these commands, Kawika jumped from the third level of the garage to the street below and ran. Whitfield followed soon thereafter.

Whitfield and the officers present diverging stories of what happened next. According to Whitfield, after dropping 20 feet from the garage, he picked himself up and started running toward his car, which was parked down the street. The street was illuminated by street lights. Before he got very far he "felt a force from behind" that knocked him to the ground. Not realizing he had been shot, Whitfield got up and continued to run. When he noticed that his left foot was pointing toward his right foot, he began to hop on his right leg. He was then knocked to the ground a second time. At this point, realizing that he had been shot, Whitfield remained still and waited for the police. Whitfield

denied that he had a weapon or any other object in his hands at any time during the course of these events.

Lebrón and Mangomé testified that they split up when they entered the garage. Lebrón arrived first at the scene of the arson and observed Kawika jump off the ledge. She then noticed Whitfield standing nearby with his back to her. She testified that, as she moved to within 20 feet of him, Whitfield turned his head toward her and she saw that he held a metal object with both hands. Despite their close proximity, Lebrón testified that she did not seek cover because she did not fear for her life. She then watched as Whitfield jumped down to the street below. When Mangomé arrived, Whitfield was already in the process of jumping. Mangomé did not observe a metal object in Whitfield's hands at that time.

Moving to the ledge from which Whitfield had jumped, Lebrón and Mangomé spotted Whitfield on the street below running away from the garage. Lebrón yelled "alto policia" (stop police). Both Lebrón and Mangomé testified that, at that moment, they saw Whitfield turn toward them holding a metal object in his hands. Fearing that he would shoot at them, Lebrón and Mangomé simultaneously fired their handguns.[1] Lebrón then observed Whitfield grab his leg and limp away from the garage until he eventually fell to the ground.

---

[1]Lebrón testified that she only remembers firing once, but may have fired multiple shots. Mangomé testified that he closed his eyes and fired two or three shots.

An injured Whitfield lay in the street unattended for some period of time. Mangomé testified that he left the scene to pursue Kawika immediately after the shooting and did not return until about 15 to 20 minutes later. Lebrón testified that she lingered in the garage for 8 to 10 minutes before looking for Whitfield outside. Neither Lebrón nor Mangomé located the metal object that Whitfield allegedly was carrying. Mangomé testified that when he returned to the scene, another officer showed him a metal object in the street. The officer who allegedly found the metal object did not testify at trial, and neither Mangomé nor Lebrón could say whether the object that was found in the street was what they had seen in Whitfield's hands. They also did not know whether the object was ever fingerprinted.

Hospital x-rays revealed a communal fracture[2] of Whitfield's thigh bone. Whitfield was transferred to the Puerto Rico Medical Center, where he awaited surgery for eight days. The day after the surgery, Whitfield was released to the Navy and was transferred to the Naval hospital in Fajardo. Physicians at the Naval hospital determined that, without follow-up surgery, Whitfield's leg would not heal properly. Therefore, five days after the initial surgery, a second surgery was performed. Despite

---

[2]The plaintiffs' expert defined this as a "multiple fragment fracture."

the two surgeries, Whitfield has not recovered the full use of his left leg and continues to suffer from chronic pain.

Following the shooting, Whitfield's parents were notified that their son had been shot and was hospitalized in Puerto Rico. Shortly thereafter, they flew from their home in Ohio to Puerto Rico to visit him. They observed that he was in acute pain. After his discharge from the Navy, Whitfield returned home to live with his parents.

Whitfield brought the underlying civil rights action seeking relief under 42 U.S.C. §§ 1981, 1983 and 1985 for violations of his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Whitfield's parents, Terry and Gayle Whitfield, sought relief for emotional damages under Article 1802 of the Civil Code of Puerto Rico. The plaintiffs alleged that Sergeant Lebrón and Officer Mangomé had violated Whitfield's constitutional right to be free from the use of excessive force. They further alleged that the city of Fajardo; the mayor, Anibal Meléndez-Rivera; and the police commissioner, Ismael Álvarez-Monge, were liable for failing to adopt regulations governing the proper use of firearms and to train municipal police officers in accordance with such regulations.

Following a flurry of pre-trial motions,[3] the district court denied cross-motions for summary judgment on the issues of supervisory and municipal liability.  The court also denied motions to dismiss and for summary judgment seeking to invoke the qualified immunity defense on behalf of the officers, the mayor and the police commissioner.

The surviving claims of excessive force and municipal and supervisory liability were heard by a jury.  At the close of the plaintiffs' case, and again at the close of all evidence, the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a).  Finding that the validity of the claims and defenses hinged on the resolution of disputed facts, the court denied these motions and submitted the case to the jury.  The jury thereafter returned a verdict in favor of the plaintiffs on all claims, and awarded the plaintiffs $5 million in compensatory and $98,000 in punitive damages.  The court again denied the defendants' effort to invoke qualified immunity and entered judgment consistent with the verdict and the jury's award of damages.

The defendants filed a joint post-trial motion seeking judgment as a matter of law or a new trial, see Fed. R. Civ. P. 50(b), 59(a), or a remittitur of the damages award, see Fed. R.

---

[3]The district court dismissed plaintiffs' conspiracy claims under 42 U.S.C. §§ 1983 and 1985, plaintiffs' racial discrimination claim under 42 U.S.C. § 1981, and plaintiffs' Eighth Amendment claim.  These rulings are not challenged on appeal.

Civ. P. 59(e). They argued that the two police officers, the mayor, and the police commissioner should have been afforded qualified immunity because their conduct had been reasonable under the circumstances. The city, the mayor, the police commissioner, and Sergeant Lebrón additionally argued that grounds for the imposition of municipal and supervisory liability had not been established. The defendants also argued that the district court had committed several evidentiary, instructional and trial management errors necessitating a new trial. Finally, the defendants argued that a remittitur was required because the compensatory damages were excessive and punitive damages were not warranted. The district court denied the defendants' joint post-trial motion on all grounds. This appeal followed.

## II.

### A. Qualified immunity: officers Lebrón and Mangomé

Defendants Lebrón and Mangomé argue that the district court erred in not granting them qualified immunity for two reasons. First, they argue that the plaintiffs failed to present sufficient evidence to establish a violation of Whitfield's constitutional rights. Second, they argue that their conduct was objectively reasonable under the circumstances. They emphasize that they were forced to make a split-second decision, under hostile circumstances, about whether their use of deadly force would be justified. Given the volatility of the situation, most

notably their belief that Whitfield was turning to shoot at them, they argue that their decision to fire in self-defense was not unreasonable.  The fatal flaw in the defendants' argument is that it ignores the clear implication of the jury's verdict: that the jury did not believe their self-defense story.

We review the district court's denial of qualified immunity de novo.  See Jarrett v. Town of Yarmouth, 331 F.3d 140, 146 (1st Cir. 2003).  When, as here, the defendants appeal from a denial of qualified immunity after a jury verdict has been rendered, the evidence is "construed in the light most hospitable to the party that prevailed at trial," and deference is "accorded the jury's discernible resolution of disputed factual issues."  Id. at 147 (quoting Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999)).

The doctrine of qualified immunity provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties.  See Anderson v. Creighton, 483 U.S. 635, 638 (1987).  It is a compromise that "strives to balance [the] desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive."  Buenrostro

v. Collazo, 973 F.2d 39, 42 (1st Cir. 1992).  Public officials are therefore entitled to qualified immunity unless the facts establish that their conduct violated a constitutional right that was "clearly established" at the time of the violation such that a reasonable officer would have known that the conduct at issue was unlawful.  Santana v. Calderon, 342 F.3d 18, 23 (1st Cir. 2003).

We ordinarily assess claims of qualified immunity under a three-part test.  Riverdale Mills v. Pimpare, 392 F.3d 55, 60-61 (1st Cir. 2004).  First, we ask whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a violation of a constitutional right.  Id. at 61 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Second, we ask whether that constitutional right was clearly established at the time of the alleged violation.  Id.  And third, we ask whether a reasonable officer, similarly situated, would understand that his or her conduct violated that clearly established right. Id.

In an excessive force case, the threshold constitutional question is analyzed under the Fourth Amendment's objective reasonableness standard.  See Saucier, 533 U.S. at 204-05 (citing Graham v. Connor, 490 U.S. 386, 394 (1989)).  Under this standard, if an officer "reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." Id. at 205.  In denying the defendants' pre-trial and mid-trial motions seeking to invoke

-11-

the qualified immunity defense, the district court found that there were material factual disputes bearing on whether the defendant police officers had acted reasonably under the circumstances.  The primary dispute concerned whether Whitfield posed a threat to the officers at the time that they shot him.  Specifically disputed was whether Whitfield was running away, or whether he had stopped running and had turned toward the officers with a metal object in his hand.

The jury entered a verdict for the plaintiffs, specifically finding that Lebrón and Mangomé "showed deliberate indifference in committing acts that violated [Whitfield's] right not to be subjected to excessive or unreasonable force during an arrest."  In addition to compensatory damages, the jury awarded punitive damages, finding that "the defendants acted with malice or with intent or reckless indifference to violate" Whitfield's constitutional rights.  In light of these findings, the district court denied qualified immunity for the police officers and entered judgment for the plaintiffs.

We need not linger on the threshold question -- whether the evidence established a constitutional violation.[4]  The Supreme

---

[4]Although the Supreme Court has stated that the constitutional inquiry should consider the "facts alleged" and the "parties' submissions," Saucier, 533 U.S. at 201, when reviewing a post-verdict qualified immunity ruling, we accept "the jury's discernible resolution of disputed factual issues." Jarrett, 331 F.3d at 147; Wilson v. City of Boston, 421 F.3d 45, 53-54 (1st Cir. 2005).

Court concluded twenty years ago that a police officer may not use deadly force against a fleeing suspect unless it is necessary to prevent the suspect's escape and the suspect poses a significant threat of death or serious physical injury to the officer or others. See Tennessee v. Garner, 471 U.S. 1, 11 (1985); Jarrett, 331 F.3d at 149 ("[T]he use of deadly force is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians."). The police officers in this case defended their actions by arguing that they had shot Whitfield in self-defense. "[T]he problem with this argument is that it depends upon the officers' version of the facts--a version the jury plainly rejected." Acosta v. City of San Francisco, 83 F.3d 1143, 1148 (9th Cir. 1996) (quoting Posr v. Doherty, 944 F.2d 91, 95-96 (2d Cir. 1991)); Stephenson v. Doe, 332 F.3d 68, 78 (2d Cir. 2003) (holding that the jury's verdict of liability on excessive force "apparently credited] [the plaintiff's] account that he was not given adequate warning and was unarmed and fleeing when he was shot"). The evidence here was sufficient to support a finding that an unarmed Whitfield was shot from behind as he fled. The jury apparently credited this version of the events and we see no basis for disturbing its finding.

With the jury having supportably found a violation of Whitfield's Fourth Amendment right to be free from excessive force, we next consider whether the right was clearly established at the

time of the incident and whether "an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right." Wilson v. City of Boston, 421 F.3d 45, 58 (1st Cir. 2005) (internal quotation omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202 (quoting Anderson, 483 U.S. at 640). Although the Supreme Court has cautioned that in many cases the generalized holdings of Garner and Graham will not provide sufficient notice to police officers, the Court has also acknowledged that, in the obvious case, the standards announced in those decisions alone are sufficient to "'clearly establish' the answer." Brace v. Hagen, 543 U.S. 194, 125 S. Ct. 596, 599 (2004); Hope v. Pelter, 536 U.S. 730, 741 (2002) ("[Officials can still be on notice that their conduct violates established law even in novel factual circumstances.").

        Viewing the facts in the light most favorable to the verdict, the district court correctly concluded that a reasonable officer, similarly situated, would understand that his or her conduct violated the rights clearly established in Garner and Graham. This is especially true given the factual similarity between Garner and the present case. In Garner, a burglary suspect

-14-

attempted to escape the police by climbing over a chain link fence. See 471 U.S. at 3. Although the arresting officer did not see a weapon on the suspect, he shot the suspect in the back of the head as he climbed the fence. See id. at 3-4. Applying the Fourth Amendment balancing test, the Supreme Court stated that, while it "is no doubt unfortunate when a suspect who is in sight escapes, . . . the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, noncancerous suspect by shooting him dead." Id. at 11. See also Ellis v. Wynalda, 999 F.2d 243 (7th Cir. 1993) (denying qualified immunity where a police officer shot a burglary suspect in the back after the suspect threw a light-weight mesh bag and a jacket at the officer and then turned and ran away); Davis v. Little, 851 F.2d 605, 607-08 (2d Cir. 1988) (finding a Fourth Amendment violation where a fleeing felon, who had allegedly punched and shoved two police officers in making his escape, was subsequently shot by one of the police officers who knew the felon was unarmed). Because the jury rejected the defendants' contention that Whitfield appeared threatening, the district court correctly concluded that Lebrón and Mangomé were not entitled to qualified immunity.

## B.    Municipal and supervisory liability

The jury found municipal and supervisory liability on the theory that Whitfield's injuries were a direct result of a "policy

or practice" of the mayor and the police commissioner "and/or [their] failure to properly train [the Fajardo police] and [to] adopt and enforce regulations as to the proper use of force and the proper use of firearms." According to the plaintiffs' theory, the absence of any municipal regulations governing the use of deadly force illustrated that the mayor and the police commissioner (and by implication, the city) were deliberately indifferent to the constitutional rights of the citizens of Fajardo.

The district court denied the defendants' joint motion for judgment as a matter of law or for a new trial. The court found three pieces of evidence in support of the jury's verdicts: the police commissioner's testimony that Fajardo did not have regulations governing the use of force, the mayor's testimony that he was unaware of any municipal regulations governing the use of force, and Whitfield's testimony concerning the incident itself. Although the defendants had presented evidence that the Puerto Rico Police Department had promulgated Commonwealth-wide regulations governing the use of force, the court found that the testimony of the mayor and the police commissioner created a factual dispute as to whether Fajardo had adopted these regulations and trained its police in accordance with them. According to the court, the jury could have inferred, from Whitfield's testimony concerning Lebrón and Mangomé's conduct, that the officers had not been properly trained.

We review the district court's denial of a motion for judgment as a matter of law de novo.  See Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 237 (1st Cir. 2005).  This review requires us to "examine the evidence in the light most favorable to the plaintiff [to] determine whether there are facts and inferences reasonably drawn from those facts which lead to but one conclusion -- that there is a total failure of evidence to prove plaintiff's case."  Acevedo-Garcia, 351 F.3d at 565 (internal quotation omitted).  We review a denial of a motion for a new trial for an abuse of discretion, see Baron, 402 F.3d at 237, and will order a new trial only if "the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice."  Acevedo-Garcia, 351 F.3d at 565 (internal quotation omitted).

### 1.   Fajardo's liability

Fajardo argues that the district court erred in concluding that there was sufficient evidence to support the jury's finding that the city had been deliberately indifferent to the rights of its citizens.  Fajardo disputes the court's interpretation of the police commissioner's testimony, and the significance of the mayor's and Whitfield's testimony.  Moreover, Fajardo contends that the plaintiffs' theory, that Fajardo failed to properly train its police, was proven false by Fajardo's uncontested evidence demonstrating the training that Lebrón and

Mangomé had received. Given this undisputed evidence, Fajardo additionally argues that the plaintiffs failed to prove that a deficient training program caused Whitfield's injuries. We agree that the evidence was insufficient to establish a deficient training program in Fajardo.

A city may only be held liable under § 1983 for its own unconstitutional action. See Monell v. Dep't of Social Services, 436 U.S. 658, 691 (1978). This means that, under § 1983, a municipal government will only be held liable when the "execution of [the municipal] government's policy or custom . . . inflicts the injury." Id. at 694.

A city's policy of inadequately training its police force can serve as a basis for § 1983 liability if the city's failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). In this context, deliberate indifference will be found where the municipality fails to provide adequate training notwithstanding an obvious likelihood that inadequate training will result in the violation of constitutional rights. Id. at 390. The plaintiff must also prove that "the deficiency in training actually caused the police officers' indifference" to the public's constitutional rights. Id. at 391. A generalized showing of a deficient training program is not sufficient. The plaintiff must establish that the particular officers who committed the

-18-

violation had been deprived of adequate training, and that this specific failure in training was at least a partial cause of the ultimate injury.  See Young v. City of Providence, 404 F.3d 4, 26 (1st Cir. 2005).

The parties agree that the Puerto Rico Police Department had promulgated regulations governing the proper use of deadly force and that these regulations were applicable to the municipal police as well as to the Commonwealth police.[5]  The district court, however, found that there was a factual dispute as to whether Fajardo had adopted these regulations and trained police officers in accordance with them.  The plaintiffs' primary evidence establishing this claim was testimony by the mayor and the police commissioner to the effect that there were no municipal regulations concerning the use of deadly force.  According to the court, the jury could infer from this evidence, and from Whitfield's testimony concerning the officers' conduct in violating his constitutional rights, that the officers had not been properly trained in the use of deadly force.

---

[5]In its order denying the defendants' joint post-trial motions, the district court took judicial notice of Commonwealth of Puerto Rico Police Department General Order 95-13, but refused to consider General Order 99-4, which had not been brought to the court's attention until after trial.  Fajardo argues that the court's refusal to take judicial notice of the latter regulation was error.  Because Fajardo prevails on the issue of municipal liability regardless of our resolution of this question, we bypass this argument.

Such an inference was not warranted on the undisputed facts of this case.  The undisputed evidence is that both officers were in fact trained by the Puerto Rico Police according to the policies of the Puerto Rico Police Department.  General Order 95-13, a Puerto Rico Police regulation enacted pursuant to the Municipal Police Act,[6] provided guidance concerning the use of deadly force consistent with Tennessee v. Garner.[7]  The defendants' evidence included diplomas certifying that both officers had successfully completed the intensive preparatory course administered by the Puerto Rico Police Department, certificates of

---

[6]As a municipality of Puerto Rico, Fajardo is subject to the Commonwealth's "Municipal Police Act."  See 21 P.R. Laws Ann. § 1061, et seq.  Under the Act, all the members of a municipal police force must complete "the basic training courses offered by the School of Police Science of the Puerto Rico Police Academy."  21 P.R. Laws Ann. § 1066.  They must pass "an intensive preparatory course which shall be designed in coordination with the Commonwealth Police and which shall be administered by the Commonwealth Police Academy."  21 P.R. Laws Ann. § 1067(e).  Local police are not certified as "Municipal Police Officers" until they meet the training requirements of the Commonwealth Police Department.  See 21 P.R. Laws Ann. § 1063.

[7]General Order 95-13, in effect from 1995 until 1999, provided, in relevant part:

> 1.  When utilizing a firearm only the minimum amount of force necessary to fulfill the mission shall be utilized.
> 2.  The regulations weapon shall be considered a defense weapon, NOT an arrest tool.
> 3.  Any other means and/or alternative shall be utilized before recurring [sic] to the use of the regulations weapon.
> 4.  Firing a firearm from or against a moving vehicle is forbidden, unless the people in the other vehicle are utilizing mortal physical force against the policeman or other citizens.

-20-

training received by both officers establishing that they had participated in ongoing training in the proper handling and use of firearms, and the testimony of Mangomé and Lebrón that they had been trained concerning the constitutional standard for employing deadly force.  Lebrón and Mangomé specifically testified that they had been trained that a police officer may only use deadly force when the officer's life or the life of another person is in danger.[8]  None of this evidence was disputed or impeached.[9]

Given this evidence of training, the plaintiffs bore the burden of establishing a material factual issue with respect to whether the training received did not include adequate instruction on the proper use of deadly force.  The plaintiffs' evidence failed to raise such a dispute.  Whether Fajardo promulgated its own regulations is irrelevant to the lack of training claim, and the plaintiffs' evidence does not otherwise rebut or contradict the evidence that Lebrón and Mangomé were trained in accordance with

_____

[8]Mangomé testified that he had received training by the Commonwealth Police at the academy and at refresher classes held at the local police station concerning how to apprehend a fleeing suspect.  He testified that the training sessions taught him that "[y]ou only fire the weapon once you feel your life or the life of another is threatened."  Lebrón likewise testified that she was trained that she could use her weapon "[a]s soon as I was subject at any time to imminent danger."

[9]The plaintiffs argue that the verdict illustrates that the jury disbelieved Lebrón and Mangomé.  The verdict, however, only indicates that the jury disbelieved the officers' self-defense story.  The award of punitive damages against Lebrón and Mangomé suggests, to the contrary, that the officers were aware, or should have been aware, that their conduct violated Whitfield's constitutional rights.

the Municipal Police Act and the related Police Department regulations governing the use of force.

The testimony of the mayor and the police commissioner does not create a factual dispute as to whether Fajardo had actually adopted or enforced these regulations. The police commissioner's testimony, which consisted of a portion of his deposition testimony that was read into evidence, is insufficient on its face to rebut the evidence of training in the record:

> Q. Aside from the regulations is there any written guideline for police officers . . . by which they're given guidelines on the excessive use of force or on the usage of a firearm aside from the regulations?
>
> A. The regulation does not specify telling a person when it is going to be used and when it is not going to be used. . . . In other words, this is a matter . . . for the police officer to determine himself at that time he finds himself in a situation. In other words, there's nothing in writing. There is no kind of guideline that tells a police officer when to use the force and when he is not going to use it.
>
> *  *  *
>
> Q. In other words, that the guidelines that the Fajardo Municipal Police have with regards to when to use or not to use or when it's adequate to use or not use a firearm do not exist in writing?
>
> A. No. For . . . no, no, definitely. That's a matter that at the moment that the police officer is protecting his life and protecting the lives and properties which are his functions. In other words, there's nothing in writing with regards to that.

-22-

> Q.  Is there any policy or unwritten practice on behalf of the Fajardo Municipal Police with regards to when it is adequate or not to use a firearm?
>
> A.  There's no practice nor any public policy with regards to that, neither verbal nor in writing.

(Emphasis added).  On cross-examination, the police commissioner explained that his deposition answers were

> based on the questions that were posed to me as to whether the municipality had anything in writing with regards to the use of firearms. And at that time I understood that the question was in reference to the municipality and not to the Municipal Police Force. . . . In Puerto Rico Police regulations the usage of firearms is set forth.

(Emphasis added).

The police commissioner's testimony explicitly noted the existence of Puerto Rico regulations governing the use of force by police.  Indeed, the plaintiffs' inquiry began with the qualifying phrase "aside from the regulations."  The police commissioner merely conceded that, although there are Commonwealth regulations governing the use of force, the municipality has not created a more specific set of guidelines or standard operating procedures. Rather, the police officer in the field is required to apply the regulations to the specific situations in which he finds himself. The police commissioner never suggested that Fajardo's police officers are not trained with regard to the proper use of force. The mayor's testimony, as to his unawareness of any municipal

-23-

regulations, is similarly unhelpful to the plaintiffs. At most, it establishes that Fajardo did not promulgate its own set of regulations; it does not, however, establish a policy of inadequately training the Fajardo police force.

Without any independent evidence of an inferior training program, the jury could not have inferred, merely from Whitfield's testimony of the incident itself, that there was a policy or custom of inadequate training in Fajardo. See Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) (a single shooting incident insufficient to establish municipal liability for inadequate police training); Fabiano v. Hopkins, 352 F.3d 447, 452 (1st Cir. 2003) (absent some other evidence of an unconstitutional policy or custom, "a single incident of misconduct cannot provide the basis for municipal liability under § 1983").

Given the undisputed evidence of training, the plaintiffs failed to satisfy the threshold burden of establishing either that Fajardo failed to train Lebrón and Mangomé, or that the training received by Lebrón and Mangomé was "inferior by the standards of the profession." Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. 1989).[10] Moreover, even were we to accept that the city's training

_____

[10]We pause to emphasize the distinction between the present case and our recent decision in Young v. City of Providence, 404 F.3d 4 (1st Cir. 2005) (reversing the district court's award of summary judgment to the city). In that case there existed material factual disputes and inconsistent testimony regarding the extent of police training. See id. at 27-28. Here, by contrast, the evidence is uniform that officers Lebrón and Mangomé were trained in the proper use of force.

program was lacking in some respect, there is nothing to indicate that the city was deliberately indifferent to the rights of its citizens. See DiRico v. City of Quincy, 404 F.3d 464, 469 (1st Cir. 2005); Santiago, 891 F.2d at 382 (holding that evidence that police officers only received four hours of training with regard to constitutional issues did not establish "a 'conscious' policy to train inadequately").

The plaintiffs advance an alternative basis for holding Fajardo liable: that the Fajardo police department fostered "a culture of leaving it to the officer," thereby granting its officers carte blanche to exercise unfettered discretion in the field. According to this theory, even if Fajardo's police officers were properly trained, the Fajardo police department's encouragement of its officers to make unrestricted on-the-spot determinations about how much force to employ superseded any training they had previously received. The plaintiffs argue that Fajardo should be held liable for this unconstitutional "custom."

There are two requirements to prove a claim grounded on custom. First, the custom or practice must be attributable to the municipality. That is, it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989). Second, the custom must have been the cause of

-25-

and "the moving force behind" the constitutional violation. Id. at 1157.

Plaintiffs point to three pieces of evidence supporting their theory that Fajardo had an unconstitutional custom: (1) the police commissioner's deposition testimony that it was up to individual officers to determine the appropriate level of force; (2) the mayor's testimony that he was unaware of any municipal regulations governing the use of force; and (3) the fact that neither Lebrón nor Mangomé were disciplined for the incident.

But again, even viewed in the light most favorable to the plaintiffs, the mayor and the police commissioner's testimony does not establish that Fajardo police officers had unfettered discretion to employ deadly force. The police commissioner merely testified that police officers in the field are given the discretion to apply the regulations to the particular circumstances that they face, and the mayor simply answered the plaintiffs' narrow question: whether he was aware of any municipal regulations. No reasonable juror could infer from the mayor's and the police commissioner's testimony that the Fajardo police department gave its police officers blanket authority to disregard the constitutional limitations imposed on the use of deadly force.

Finally, the fact that neither Lebrón nor Mangomé was disciplined for this incident, see Wierstak v. Heffernan, 789 F.2d 968, 975 (1st Cir. 1986) (finding the lack of an internal

investigation into allegations of excessive force by police officers to be probative of the city's gross negligence), does not provide a sufficient basis by itself to support the jury's verdict. In Wierstak, among the probative evidence supporting municipal liability was the fact that the city had never conducted "any sort of investigation into the circumstances" of the plaintiff's allegedly unlawful arrest. Id. at 975 (emphasis added). In this case, however, there was an investigation into the shooting incident. According to Mangomé, the investigation concluded that Lebrón and Mangomé had been justified in their use of force. Given that the question of whether Lebrón and Mangomé were justified in firing at Whitfield was fact-based and was hinged on competing versions of the events, it is not surprising that two different fact-finders (the police investigators and the jury in this case) came to two different conclusions. Standing alone, the lack of any disciplinary charges against Lebrón and Mangomé is not probative of a "well settled and widespread" policy or custom. See Santiago, 891 F.2d at 382. Nor does it establish deliberate indifference by the city. See DiRico, 404 F.3d at 469.

### 2.  The mayor's and the police commissioner's liability[11]

As set forth above, the mayor and the police commissioner, like the city of Fajardo, were held liable for failing to promulgate regulations regarding the proper use of deadly force, and for failing to adequately train the police in accordance with such regulations.  They argue, similarly to Fajardo, that there was no evidence of deliberate indifference, nor was there evidence of a causal link between the allegedly deficient training and the injury to Whitfield.

Like municipal liability, supervisory liability cannot be predicated on a respondeat superior theory.  Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1st Cir. 1999).  Supervisors may only be held liable under § 1983 on the basis of their own acts or omissions.  Id.  Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that amounts to condonation or tacit authorization.  See Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999).  Absent direct participation, a supervisor may only be held liable where "(1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or

---

[11]As Mangomé's immediate supervisor, Sergeant Lebrón was also found liable under a theory of supervisory liability.  Because we uphold the district court's conclusion that Lebrón is liable as a direct participant in the unconstitutional conduct, we do not address her argument that she should not be held liable as a supervisor.

inaction was 'affirmatively link[ed]' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence . . . amounting to deliberate indifference.'" Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir. 1995) (quoting Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902-03 (1st Cir. 1988)).

Our holding with respect to Fajardo's municipal liability informs our analysis of the mayor's and the police commissioner's supervisory liability. Because the plaintiffs failed to provide sufficient evidence establishing that Fajardo's police officers were inadequately trained, it follows that the plaintiffs failed to prove that the mayor and the police commissioner were deliberately, recklessly or callously indifferent to the constitutional rights of the citizens of Fajardo. The plaintiffs failed to show that there were any training deficiencies, much less that the mayor or the police commissioner "should have known that there were . . . training problems." Febus-Rodriguez v. Bentancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994). Moreover, as discussed above, the evidence was insufficient to support the theory that the mayor or the police commissioner had condoned an unconstitutional custom.[12]

---

[12]Lebrón and Mangomé also request a new trial based on several alleged evidentiary and trial management errors by the district court. Because the defendants have entirely failed to present any developed argumentation concerning these issues, we deem them waived. See Acevedo-Garcia, 351 F.3d at 560-61 ("We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation.") (quotation omitted); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## C.    Damages

The jury, which decided to hold the defendants jointly and severally liable, awarded Whitfield $4 million in compensatory damages for his mental and physical damages and pain and suffering, and Whitfield's parents $500,000 each in compensatory damages for their emotional damages and pain and suffering.[13]  Additionally, finding that the defendants "had acted with malice or with intent or reckless indifference to violate . . . Whitfield's federally protected constitutional rights" the jury awarded Whitfield $98,000 in punitive damages payable by each defendant in his or her individual capacity: $15,000 each from officers Lebrón and Mangomé, $18,000 from the police commissioner, and $50,000 from the mayor. In their joint post-trial motion, the defendants argued that the award of compensatory damages and punitive damages was excessive and sought a remittitur.  The district court denied the motion.

On appeal, the defendants argue that Whitfield's compensatory damages award was grossly excessive in light of the conflicting evidence concerning the nature and the extent of his injuries.  Particularly, they argue that there is little evidence establishing the permanency of Whitifield's injuries.  The

---

[13]Whitfield's parents' supplemental state law claims were brought under Article 1802 of the Civil Code of Puerto Rico -- Puerto Rico's general tort law statute.  That statute allows a plaintiff to collect damages from "a person who by an act or omission causes damage [to the plaintiff] through fault or negligence."  31 P.R. Laws Ann. § 5141.

defendants also renew their argument that the award of $500,000 to each of Whitfield's parents is grossly disproportionate to the evidence of their mental or emotional pain and suffering, and challenge the awards of punitive damages.[14]

Our inquiry on appeal is "limited to determining whether the trial court abused its discretion in refusing to set aside the verdict as excessive." Acevedo-Garcia v. Monroig, 351 F.3d 547, 566 (1st Cir. 2003) (internal quotations omitted). While our review of the punitive damages award is de novo, we will only alter the award if "we find it certain that the amount in question exceeds that necessary to punish and deter the alleged misconduct." Id. (internal quotation omitted). Because of our deference to the jury's calculation of damages -- particularly in cases that involve little or no economic loss -- we impose a heavy burden on the

---

[14]The defendants also contend that the jury was erroneously instructed that the defendants could be held liable not only for the immediate injury resulting from the shooting, but also "for any additional damages sustained as a consequence or result of subsequent malpractice by those who provided medical care to [Whitfield] in treating his injuries." They argue that, under Puerto Rico law, a defendant may only be held liable for a third-party's malpractice when the medical treatment provided by the third-party was reasonably required. See Rodriguez Sosa v. Cerveceria India, 106 D.P.R. 479, 483 (1977); Mercedes v. Gobierno de la Capital, 85 D.P.R. 552 (1962). The defendants claim that Whitfield's own expert testified that the second operation was not necessary. Therefore, the defendants contend, the court's instruction was erroneous, and the court should have granted a remittitur or a new trial on damages to correct the jury's award. In our view, the expert's testimony could not ground a finding by the jury that the second operation was beyond that which was reasonably required. Thus, even if we assume arguendo that the court's instruction was faulty, the error was harmless; the jury could only have found as it did.

defendants to prove that the damage award is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Id. (internal quotations omitted); Grajales-Romero v. Am. Airlines, Inc., 194 F.3d 288, 300 (1st Cir. 1999) (applying the above federal standards for judging excessiveness in a Puerto Rico case). Thus, we will not disturb a damages award merely because we find it extremely generous, but will only reverse if we find the award "so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law." Koster v. Trans World Airlines, 181 F.3d 24, 34 (1st Cir. 1999).

### 1. Whitfield's compensatory damages

Although there is evidence that Whitfield suffered through a terrifying and painful experience, and there is evidence that at least some aspects of his injuries are permanent, we conclude that an award of $4 million dollars solely for his mental and physical pain and suffering[15] is unconscionable as a matter of law in this case.

---

[15]The plaintiffs' brief argues that some portion of Whitfield's award is attributable to economic damages for lost income. The jury's award, however, clearly did not contemplate economic damages. The verdict form and the jury instructions, which were not objected to, only provided for "mental or emotional suffering or physical damages or pain and suffering." Moreover, the evidence of lost income was not sufficiently specific to ground an award on that basis.

The defendants cite to a number of cases in attempting to illustrate the excessive nature of Whitfield's damages. See Anthony v. G.M.D. Airline Services, Inc., 17 F.3d 490 (1st Cir. 1994) (overturning a $571,000 jury award to a plaintiff who sustained a leg injury resulting in a 20 percent whole-body disability); Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989) (upholding a jury award of $4.5 million to a plaintiff who was rendered paraplegic after being shot in the back by police); Torres v. Kmart Corp., 233 F. Supp. 2d 273 (D.P.R. 2002) (upholding a jury award of $1.6 million to a plaintiff whose slip-and-fall resulted in a permanent back injury); McCollum v. McDaniel, 136 F. Supp. 2d 472 (D. Md. 2001) (reducing an award of $3.5 million to $1.25 million in an excessive force case where the plaintiff lost an eye and suffered permanent impairment to one hand). We cannot just rely on these cases, however, because they are all distinguishable from the present case in important respects. For instance, although Gutierrez-Rodriguez presents the most comparable factual circumstances, it is not particularly helpful as a comparison because it was decided 16 years ago. Moreover, our "paramount focus in reviewing the damage award must be the evidence presented at trial," for we will not disturb a jury award "merely because the amount of the award is somewhat out of line with other cases of a similar nature." Gutierrez-Rodriguez, 882 F.2d at 579-80.

The evidence established that Whitfield was shot twice in the back of the left leg, the first shot entering the back of his calf, and the second shot entering his thigh and shattering his femur. According to Whitfield, he lay face-down bleeding in the street for what "seemed like" 15 minutes before the police came to him.[16] They then handcuffed him and did not provide him any medical treatment until the ambulance arrived. When Whitfield arrived at the Fajardo hospital, the police threatened to withhold medical attention until he would give a statement. Whitfield, still suffering "excruciating" pain, waited eight hours for an assessment of his injuries before he was transferred to Puerto Rico Medical Center where he waited another eight days for his first surgery. The following day he was transferred to the Naval hospital where doctors performed a second surgery on Whitfield's leg.

There is evidence that some of Whitfield's injuries are permanent. Whitfield's expert testified that to correct Whitfield's shattered femur, doctors had to attach a metal rod and a metal plate to his femur using ten screws. He further testified that the bullet that entered Whitfield's calf partially ruptured the nerves in his calf causing permanent neurological damage and resulting in a limited range of motion in Whitfield's left ankle. The expert also testified that Whitfield "has permanent atrophy in the outer . . . aspect of his left thigh." Finally, he testified

---

[16]The officers' testimony establishes that he laid in the street unattended for at least 8 to 10 minutes.

that a weakened ligament in Whitfield's knee, combined with the permanent atrophy in his thigh, leaves Whitfield with a weak knee that will continue to be a problem for Whitfield in the future.

The result of these injuries, according to Whitfield's expert, is a 48 percent impairment of his left lower extremity and a 19 percent impairment of his entire body. Because Whitfield's weakened ankle has a tendency to roll and his weakened knee has a tendency to give out, he is unable to participate in many different activities and sports. Whitfield also has a condition in his left leg and foot called "disestesias," which is an "abnormal sensation of pin, needle, burning, unpleasant sensation, [and] itching." Whitfield testified that when he wakes up in the morning his leg is often sore and he gets cramps in his foot. Whitfield's parents also testified that they frequently observe their son in pain.

While some evidence tends to undercut Whitfield's claims -- the concession of Whitfield's expert that Whitfield can walk normally, Whitfield's admissions that ten months after the incident he passed the Navy's physical readiness test by running a quarter-mile in 2 minutes and 20 seconds, that some months later he was able to lift a 40-pound tire off a four-foot-high stack of tires while working in the automotive department of a wholesale retailer, and that he has not taken any pain medication since May 2002 -- the jury was not required to accord significant weight to this evidence. Nevertheless, viewing the evidence in the light most

favorable to Whitfield, we conclude that the award of $4 million was grossly disproportionate to the evidence of Whitfield's injuries. In closing argument before the jury, Whitfield's attorney stated that "the kind of pain and suffering that this young man is going through, and will go through, is worth at least $2 million." Although this statement was an attempt to set a floor, not a ceiling, it acknowledged that an award of $2 million would, at a minimum, sufficiently compensate Whitfield for his pain and suffering. We can accept that the jury might award a higher amount, but we cannot divine the basis for an award that doubles the amount that the plaintiff had conceded would be sufficient compensation. After a careful review of the record, we conclude that the evidence of Whitfield's physical and mental pain and suffering would not support a maximum recovery in excess of $3 million. See Koster v. Trans World Airlines, 181 F.3d 24, 36 (1st Cir. 1999) (setting forth the "maximum recovery rule" whereby this court sets a remittitur amount that "represents the highest amount for which there is adequate evidentiary support"). We therefore remand to the district court with instructions to vacate the $4 million award and order a new trial on compensatory damages for Whitfield, unless Whitfield agrees to remit $1 million.

### 2. Whitfield's parents' compensatory damages

There is a case that is sufficiently similar and close in time to be useful as a comparison in assessing the proportionality

of Whitfield's parents' compensatory damage awards. In Smith v. Kmart Corp., 177 F.3d 19 (1st Cir. 1999), we ordered that an award of $250,000 to the husband of a woman who had been injured by a falling ice cooler be remitted to $100,000. Although there are aggravating circumstances in this case that were not present in Smith -- the fact that Whitfield was shot by police, that his parents were forced to travel from Ohio to Puerto Rico to see their son in the hospital, and that Whitfield's father was himself just recovering from surgery -- there were several aggravating circumstances in Smith that are not present here. Most notably, the plaintiff in Smith was present at the scene of the accident and testified to his horror in watching as his wife was struck and lost consciousness. See id. at 32. He testified that he performed CPR on his wife and thought, at various times, that she was either dead or paralyzed. See id. Moreover, he testified to all of the medical visits on which he had accompanied his wife, that he constantly worried about her condition, and that he was emotionally and mentally tired. See id. The plaintiff in Smith, who had a loss of consortium claim, testified that due to his wife's injuries he was forced to do more housework and to work longer hours at his job, and that his relationship with his wife had lost all of its intimacy. See id.

Here there is no loss of consortium, nor is there any specific evidence showing that Whitfield's parents do not enjoy the

-37-

same quality of life they enjoyed before the incident. There is only generalized testimony that his mother and father were "very upset" when they learned what had happened. Gayle Whitfield testified that she was so distraught that she could not work for a month. She also testified that she has observed her son in pain and that she worries about the difficulties he will encounter in the future. Terry Whitfield testified that he was shocked by the news that his son was shot. The father similarly testified that he has witnessed his son in pain and that he worries about his future. The parents did not, however, provide any expert testimony concerning their emotional distress. See Koster, 181 F.3d at 35 (testimony from mental health expert not required to prove emotional distress, but absence of such evidence is relevant to amount of the award).

This generalized evidence of Whitfield's parents' emotional pain and suffering "does not rise to a level commensurate with the amount of damages awarded." Smith, 177 F.3d at 32. We therefore find the jury's award of $500,000 to each of Whitfield's parents to be grossly excessive. Under the maximum recovery rule, see supra, we order a new trial on compensatory damages for Whitfield's parents, unless they agree to remit their awards in excess of $100,000 each.

### 3.    Punitive damages

Because we vacate the verdicts as to the mayor and the police commissioner, we also vacate their portion of the punitive damages award.  Thus, we vacate the award of $50,000 in punitive damages from the mayor and the award of $18,000 in punitive damages from the police commissioner.

As to officers Lebrón and Mangomé, the defendants argue that there should be no punitive damages because there was no evidence presented of a pattern of misconduct on the part of the officers.  This argument is beside the point.  The jury had sufficient evidence to find, and did find, that the officers acted with "malice or with intent or reckless indifference" to Whitfield's constitutional rights.  A $15,000 award of punitive damages against each officer can hardly be considered excessive given the facts of this case.  The defendants also suggest that the punitive damage awards do not reflect an intention of the jury to deter future misconduct, but rather were their way of apportioning the damages "to let [the defendants] know who was responsible for what percent."  This argument is purely speculation and is contradicted by the jury's verdict.  The special verdict form gave the jury the option of imposing liability jointly and severally to all defendants or in individual amounts as to each defendant.  The jury chose to impose liability jointly and severally.  Had the jury wished to apportion the fault, it had the ability to do so.

## III.

In sum, we **affirm** the verdicts and the award of punitive damages against officers Lebrón and Mangomé, we **vacate** the verdict against the city of Fajardo, and we **vacate** the verdicts and the award of punitive damages against mayor Meléndez-Rivera and police commissioner Álvarez-Monge. We further **vacate** the compensatory damage awards and **remand** to the district court for a new trial on compensatory damages for each of the three plaintiffs, unless Justin Whitfield agrees to accept a remittitur of his $4 million award to $3 million, Terry Whitfield agrees to accept a remittitur of his $500,000 award to $100,000, and Gayle Whitfield agrees to accept a remittitur of her $500,000 award to $100,000. Each side bears its own costs.

**It is so ordered.**