# United States Court of Appeals
## For the First Circuit

No. 04-1221

SAMUEL BORGES COLÓN, ET AL.,

Plaintiffs, Appellees,

LISA MARIE DE JESUS FLORES, ET AL.,

Plaintiffs,

v.

JOSÉ R. ROMÁN-ABREU; JUAN A. NORAT-FLORES,

Defendants, Appellants,

IRAIDA HORNEDO,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Jose Antonio Fusté, Chief U.S. District Judge]

Before

Boudin, Chief Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

José J. Sánchez Vélez and Rafael A. Robles Díaz, Commonwealth
of Puerto Rico, Department of Justice, Civil Rights Legal Task
Force, with whom Yldefonso López Morales and O'Neill & Borges Law
Firm were on brief, for appellants.
Claudio Aliff-Ortiz, with whom Pablo Landrau Pirazzi and
Aldarondo & López Bras were on brief, for appellees.

February 6, 2006

**LYNCH**, **Circuit Judge**. This is the latest in a series of cases which involve the tension between a newly elected administration's ability to reorganize government, on the one hand, and, on the other hand, two constitutional limitations -- the First Amendment's prohibitions against discriminating against government employees based on their political affiliation and the Fifth and Fourteenth Amendments' prohibitions against depriving such employees of property interests in their employment without due process of law.

This court has had to address these tensions in cases, usually from Puerto Rico, in which the newly elected officials represent a particular party and the reorganization results in the termination of employment of workers of another political party. See, e.g., Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121 (1st Cir. 2004); Angulo-Alvarez v. Aponte de la Torre, 170 F.3d 246 (1st Cir. 1999). The mere fact that the impact falls mainly on members of the party which has lost power is not, of course, sufficient to warrant federal court interference with the policy choices of a new administration which reflects the voters' choice that changes are desirable. Sanchez-Lopez, 375 F.3d at 140. By the same token, a new administration cannot cloak political discrimination merely by labeling the change a legitimate reorganization. Id. at 132. Nor may it deliberately effectuate a legitimate reorganization in a politically discriminatory manner. Id. at 140.

Here, the reorganization involved a new Popular Democratic Party (PDP) administration in San Lorenzo, Puerto Rico, headed by defendant Mayor José R. Román-Abreu (Mayor Román). The new administration chose to "privatize" the sanitation division, with the result that thirty-six career employees, almost all New Progressive Party (NPP) members, were laid off. A jury found that these career employees, as well as one non-career employee from a different department, were unconstitutionally terminated from employment. As to the career employees, the jury awarded a total of $887,097 compensatory damages against defendants Mayor Román and Juan A. Norat-Flores ("Norat"), the director of the Municipality's Department of Public Works; it also awarded $108,000 in punitive damages against Mayor Román. As to the one non-career employee, the jury awarded $28,400 compensatory damages and $3,000 punitive damages against Mayor Román. The court, post-verdict, denied the defendants qualified immunity, denied motions for judgment as a matter of law and adjustment of damages, and ordered the career employees reinstated. We affirm the district court's judgment in full.

**I.**

Mayor Román and Norat appeal on five grounds. They argue that (1) there was insufficient evidence as to causation to support a finding of political discrimination, (2) both defendants were entitled to qualified immunity, (3) the district court abused its

discretion in ordering the career employees reinstated, (4) the compensatory damages were excessive, and (5) the punitive damages against Mayor Román were unwarranted. We recount the facts in favor of the verdict as a reasonable jury could have found them. Whitfield v. Melendez-Rivera, 431 F.3d 1, 2 (1st Cir. 2005).

A.        The Career Employees

Román was elected mayor of the Municipality of San Lorenzo on November 7, 2000, and took office on January 9, 2001. He defeated incumbent NPP Mayor Víctor Figueroa Orozco. He then appointed Norat, previously a Public Works employee in another city, to head San Lorenzo's Department of Public Works. The Department had several divisions, including sanitation, which was responsible for garbage collection and other cleaning tasks.

Soon after taking office, Mayor Román and other municipal officials, including Norat, began planning the possible privatization of the sanitation division. The officials testified that they did so because of lackluster garbage collection, and that they conducted a cost-benefit analysis and determined that privatization would save San Lorenzo hundreds of thousands of dollars a year. However, two PDP-affiliated witnesses -- plaintiff Samuel Borges Colón ("Borges"), a former sanitation supervisor, and Sandra González Díaz ("González"), defendant Iraida Hornedo's predecessor as municipal human resources director -- testified that Mayor Román had said in their presence that the privatization plan

was a device to force NPP workers out of government employment. Further, González testified that in privatizing the sanitation division, the Municipality did not follow its 1997 Layoff Plan, which required that transitory workers be fired first in the event of layoffs. She testified that Mayor Román and "other fellow officers . . . [and] ranking employees" had said that "with this privatization process, they were going to be able to get rid of employees that were not belonging to the political party of the people in power." She also testified, based on her experience as municipal human resources director, that the criteria used to appoint personnel in San Lorenzo after Mayor Román took office were as follows: "[t]o be affiliated with the PDP, to be acquaintances of the mayor or relatives of the mayor, to be friends with some high-ranking functionary."

Borges testified that soon after the mayoral election he met with Mayor Román, who told him "that he needed me there at public works, to help him, because the first thing he wanted to do was to take the NPP's out of the municipality." Asked about Mayor Román's attitude toward public works employees, Borges testified as follows:

> A: Well, his attitude was that, since they were NPP's, he didn't want them there.
>
> Q: And how did you know that?

A: Because they would tell me, the engineer would tell me,[1] Mr. Martin Davila would tell me, that they wanted to get rid of the NPP employees in order to place Popular Democratic Party followers.

Q: When, if at any time, did the mayor tell you that those were his intentions after he became mayor of San Lorenzo, you know?

A: On numerous occasions at Public Works, when we would meet with Mr. Norat.

Q: Do you recall what were his words?

A: That he had to get rid of the NPP employees because he had to place his people.

In the summer of 2001, Norat took the privatization proposal and the favorable cost-benefit analysis to the Municipal Assembly for approval. On August 30, 2001, the Assembly approved Municipal Ordinance No. 7 ("the ordinance"), authorizing Mayor Román to negotiate the privatization of the sanitation division. Mayor Román signed the ordinance the next day.

In the ordinance, the Municipal Assembly set conditions on the privatization process. It stated that the company with which the Municipality contracted for privatization had to agree, when hiring, "to consider all of the municipal employees who qualify within their standards of selection of employees pursuant to its Human Resources regulations." It also added a second requirement:

---

[1] Norat is an engineer. Throughout the trial transcript, witnesses refer to him as "Engineer Norat" and "the engineer."

-6-

> The remaining employees belonging to the sanitation area will be retained in their positions or will be relocated to other dependencies of the municipality pursuant to the needs of the service. . . .

> The Municipality of San Lorenzo agrees to protect and guarantee the vested rights of the regular employees who are working in the Department of Sanitation.

The city began soliciting privatization proposals. Five companies submitted proposals; the municipal bids board selected a firm called ARB and arranged for ARB to take over the Municipality's sanitation service.

On January 23, 2002, Mayor Román wrote a letter to thirty-six sanitation employees (the "career plaintiffs"), informing them that their jobs were terminated effective February 25. Though the events leading up to privatization had taken months, this was the career plaintiffs' first official notice of potential privatization or its possible effect on their jobs. Of the thirty-six career plaintiffs, thirty-five were affiliated with the NPP,[2] while the last, Borges, was a PDP member who had had a falling-out with Mayor Román over Borges' sympathy for NPP co-workers. Most of the career plaintiffs testified that Mayor Román knew their political affiliation, either because they were

---

[2] Thirty-five of the career plaintiffs, as well as transitory employee plaintiff Sheidi N. Hernández Morales, testified about their political affiliation and activities. One career plaintiff had died by the time of trial; his daughter testified on his behalf that he had been an NPP member.

neighbors or because Mayor Román had seen them participating in NPP electioneering activities.

The January 23 letter, signed by Mayor Román, stated:

> As a result of the privatization . . . the sanitation program of the Municipal Department of Public Works is eliminated, which entails the lay-off and elimination of all the positions assigned to said program.
>
> Pursuant to the above, you are laid off from your position effective February 25, 2002. You have 30 days as of the date of this communication to appeal this decision before the Board of Appeals of the Personnel System of the Government.

The letter also stated, however, that the ordinance and the contract between San Lorenzo and ARB "provide[] for the recruitment and job security of the personnel affected by this negotiation." It added that "[t]he Municipality will coordinate this process and will notify the day and time of the job interviews."

All of the affected workers were "career employees." Under Puerto Rico law, as career employees, they had vested property rights in their jobs and, in general terms, could only be removed for cause and were entitled to procedural due process protections.[3]  In this case, the 1997 Layoff Plan, which required

---

[3]  Some government employees in Puerto Rico are classified as "career" or "permanent," which is "the equivalent of having job tenure with attendant vested property rights." Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 27 n. 4 (1st Cir. 2004); see also González-De-Blasini v. Family Dep't, 377 F.3d 81, 86 (1st Cir. 2004). An alternative classification, "contract" or "transitory," means employment is under a short-term contract and does not carry property rights.  See Acevedo-Garcia v. Monroig, 351 F.3d 547, 553

that transitory workers be fired before such career workers in the event layoffs were necessary, was not followed.[4]

The January 23 letter was delivered to most of the career plaintiffs at a meeting on January 25, 2002, at the Priscilla Flores Theater. San Lorenzo's new director of human resources, Hornedo,[5] spoke to the workers, telling them that the Municipality had set up a process to help them get jobs with ARB. Hornedo also told the career plaintiffs that if any of them had questions or concerns, they could come to her office to talk with her and review their personnel files. The career plaintiffs were given ARB applications during this meeting, and some filled them out and submitted them on the spot. Unemployment officials attended the meeting, bringing along unemployment benefits forms for them to fill out.[6]

---

(1st Cir. 2003). We do not delve into the complexities of Puerto Rico law on layoff of career employees.

[4] As of January 9, 2001, San Lorenzo had seventy-one transitory employees. Plaintiffs' counsel stated during opening argument that the Román administration had hired at least 214 more since taking office in January 2001. Testimony confirmed the existence of well over one hundred such transitory hires.

[5] González had left the job in December 2001.

[6] Even though the career plaintiffs' jobs were not technically terminated until February 25, 2002, they had already worked their last shift. Norat told them that, instead of reporting to work, they should stay home and they would be paid anyway as compensatory time. During the weeks prior to February 25, ARB provided San Lorenzo with sanitation service, even though the career plaintiffs were still on the payroll.

During the months that followed, a few of the career plaintiffs obtained jobs with ARB.[7] Most, however, found themselves without jobs either at ARB or within the Municipality. Some testified that they approached Hornedo and asked her to find them other jobs in the Municipality; she told them no jobs were available. One career plaintiff, Raul Galarza Santana, said Hornedo told him she had spoken to Mayor Román, and the Mayor "had said there was no chance for me being rehired." Another career plaintiff, Ivan Rosa-Rivera, said Hornedo told him: "I am deeply sorry. This decision has already been taken. These are orders coming from above, and you are dismissed from your work." Mayor Román was in charge of all personnel decisions in the Municipality.

Many of the career plaintiffs also testified that they filled out applications with ARB but were never offered jobs or contacted for interviews. Others testified that they were offered jobs at ARB, but under conditions that made the jobs difficult or impossible to accept. The offered jobs were in Cataño and other towns some distance from San Lorenzo. Some had no way to get there for work; others said ARB offered to pick them up in San Lorenzo

---

[7] Six career plaintiffs testified that they worked for ARB at some point. Of those, one testified that he quit after one day because of the working conditions, while two others worked for ARB for several months. Three of the career plaintiffs held jobs with ARB at the time of trial; however, there was testimony that one of those three was fired for missing work to testify at the trial, while a second had been told he would be fired for the same reason.

-10-

and drive them back and forth, but that that would mean getting up at 2 or 3 a.m. and returning home at 11 p.m. -- a twenty-hour day. One of the career plaintiffs, David de Jesus-Santa, testified that he took the Cataño job, managed to get ARB to transfer him to San Lorenzo for two months, but was then told he would be assigned to Cataño again; he quit because he had no way to get there. Another, Rafael Martinez-Santana, testified that when he approached Juan Reyes Burgos, the president of ARB, to ask for work, Burgos told him that "he would give me work, but not in San Lorenzo; that the mayor [Román] had told him to give me work, but not in San Lorenzo. He did not want me in San Lorenzo."

Other evidence also established a political motivation for the elimination of the career plaintiffs' positions. Borges testified that at least four of the five former sanitation workers who kept their jobs with the Municipality after the privatization were PDP-affiliated.[8] Well over one hundred of the transitory municipal workers hired by the Román administration were PDP-affiliated. One witness testified he could not identify any NPP hires among a list of all the new transitory employees. Various career plaintiffs testified that the Municipality made no attempt to offer them these transitory jobs, even when they were qualified for the positions.

---

[8] He did not identify the party affiliation of the fifth worker.

-11-

Further, some of the plaintiffs testified that, while their job descriptions were technically eliminated, PDP loyalists were hired and took over their job duties under different titles. For example, career plaintiff Benito Claudio-Figueroa testified that he was a heavy vehicle and equipment supervisor, and that a man whom he knew to be a PDP member was performing his old job for the Municipality, under the new title "Deputy Director of Public Works." Finally, a number of career plaintiffs testified that they had been employed elsewhere in the Department of Public Works prior to the Román administration, but had been asked by Norat to switch to sanitation in 2001, after Mayor Román's election. These plaintiffs all testified that they were not offered their old positions back, and most testified that those positions were filled by workers they knew to be PDP loyalists.

The only non-NPP member among the thirty-six terminated career plaintiffs, Borges, testified that despite his PDP affiliation, he opposed political firings and said as much to Norat, the head of the Department of Public Works. Borges testified that on August 17, 2001, Norat told Borges that the Mayor was unhappy with Borges because Borges supposedly had met with a group of NPP employees who were suing the Municipality in a separate action. Borges was placed on twenty days' compensatory leave. He was placed on another leave later in the year, and in

December, he testified, he returned from an illness to find that his supervisory duties had been reassigned to a PDP loyalist.

Borges was among the employees terminated via the January 23, 2002 letter. After the meeting at the Flores Theater, he approached ARB official Burgos and told him he was available to work for ARB. He testified that Burgos told him "that he was sorry, that he could not give me work about the municipality of San Lorenzo because the Honorable Mayor had told him that . . . he could not offer work to any of the people who had been dismissed; that he could give me work, but in the municipality of Cataño." When Burgos told him the arrangement -- that he would be picked up at 3 a.m., driven to Cataño, and then driven back to San Lorenzo at night -- Borges "told [Burgos] that schedule would be impossible for me because that would mean being away from my home almost all day and night." Borges also approached Hornedo and asked her to reevaluate his case. He testified that Hornedo told him that "she had orders from the mayor that there was no more work for me."

B.        The Non-Career Employee

The other plaintiff in this appeal, Sheidi N. Hernández Morales ("Hernández"), was differently situated. She was first hired by the Municipality of San Lorenzo under a transitory, or contract, appointment effective July 1, 1993. Thereafter, she was appointed to various transitory positions in San Lorenzo over the next six years, though the appointments were not always

-13-

consecutive. In July 1999, she was hired for a six-month position as a Social Worker in the Municipality's Childcare Network; she received an excellent evaluation. Her contract as a Social Worker was renewed in January 2000 and again in July 2000 and January 2001. The last of these contracts was due to expire on September 30, 2001. On September 17, 2001, Hernández received a letter from Mayor Román telling her to make arrangements with her supervisor to use her accumulated leave time during the rest of the month. Thereafter, her contract was not renewed.

While Hernández was not a career employee and had no property interest in her job protectable under the Due Process Clause, she did produce evidence that her position continued to exist and was filled by a PDP member, and this resulted from discrimination against her based on party affiliation. González, the former human resources director, testified that Mayor Román knew that Hernández was affiliated with the NPP. Asked why Hernández' appointment was not renewed, González replied: "Every day, [Hernández' supervisor] Ms. Carmen Contrerras . . . was publicly stating, both in meetings and out of meetings, asking when she was going to be able to get rid of the two NPP affiliates who were in her office." Mayor Román made all personnel decisions in the Municipality while González worked in his administration, a period lasting from January to December 2001.

Plaintiff Hernández testified that after the PDP electoral victory, the work atmosphere in her division of municipal government became uncomfortable and hostile. Contrerras, her supervisor at the Childcare Network, harassed the NPP employees in the office, telling them that they were from the past administration and that the new administration was "going to make a big change." Contrerras told Hernández her contract was not being renewed because of lack of funds. But there was evidence that was not true: a co-worker in accounting told Hernandez that "there was going to be more funds, and, in fact, the salaries might even be raised." Eventually, PDP-affiliated employees were hired to replace Hernández and three other NPP-affiliated transitory employees who had not received new contracts.

C.      Testimony of Defendants

The defendants, Mayor Román, Norat, and Hornedo, gave a markedly different version of events. They testified that soon after Mayor Román took office, conditions in the sanitation division began to deteriorate noticeably: the number of citizen complaints about trash service skyrocketed, and garbage trucks began breaking down with more frequency.[9] This crisis, they testified, was what spurred the decision to transfer workers from

---

[9] This deterioration coincided, however, with the Municipality's decision to let the contracts of at least fifteen transitory sanitation workers expire; according to at least one witness, that caused a labor shortage that led to the decline in the quality of service.

elsewhere in Public Works into sanitation, as well as the eventual decision to privatize sanitation. The defense also pointed to the ordinance adopted by the Municipal Assembly, which cited a desire to offer "a better quality of service" as one reason to privatize.

Mayor Román and Norat testified that political affiliation had nothing to do with the privatization decision or its execution. Indeed, Mayor Román testified that he did not know plaintiff Hernández, and as to the career plaintiffs, Norat testified that city leaders pondering privatization considered it "nonnegotiable" that whoever won the contract had to hire all of the displaced workers. Hornedo testified that the administration fully intended to coordinate the displaced career plaintiffs' hiring with ARB, and to rehire those who did not find ARB jobs; she testified that most of the career plaintiffs never approached them seeking jobs and never completed the ARB hiring process. However, Mayor Román admitted on cross-examination that the January 23, 2002 termination letter did not tell the employees about the process they would have to use to seek ARB employment and did not tell them that they could seek reemployment with the Municipality.[10] Furthermore, while Hornedo testified that several of the career plaintiffs returned to ask the Municipality for jobs and were

_____

[10] This testimony dovetailed with that of many of the career plaintiffs, who expressed bewilderment when asked on cross-examination whether they had approached the Municipality and asked to be rehired. Said one: "I mean, no. They fired me. If they fired me, how can they give me a job?"

offered positions, she admitted that those positions were transitory -- much less desirable than the career jobs the plaintiffs had previously held.[11]

Mayor Román offered the defense that he relied on legal advice. He testified that he sought the advice of González and a municipal attorney in deciding how to proceed with privatization; he said they advised him that he should not follow the 1997 Layoff Plan, but instead should follow the new municipal ordinance and make sure the displaced workers were guaranteed employment with ARB. González contradicted this testimony. She testified that early in Mayor Román's term, he called her into his office and asked her to bring a list of Public Works employees. He told her to read the list and cross off the names he indicated; he explained that "he was going to get rid of some public works employees at the time of the privatization." González testified that she "told [Román] to be careful with the new lawsuit [a separate discrimination complaint concerning other employees], and that we had to follow the processes established by law." She said he replied, "I'm . . . the mayor and I make the decisions." González also testified that she thought the 1997 Layoff Plan should have been followed, that she was not consulted as to details of the

---

[11]  Hornedo testified that one fired worker, a Mr. Ventura Gomez, accepted a transitory position with the Municipality. Ventura Gomez was not among the career plaintiffs, and his political affiliation is not clear from the record.

-17-

privatization, and that the reason the Layoff Plan was not followed was that "the mayor didn't want to use it." The attorney upon whose advice Mayor Román said he relied did not testify.

Mayor Román also denied saying anything to Borges about plaintiffs' political affiliations. In fact, the Mayor testified, it was Borges who first suggested privatization to him. Borges testified to the contrary.

## II.

On May 24, 2002, the thirty-six career plaintiffs, along with Hernández and two other former municipal employees,[12] filed suit against Mayor Román, Norat, Hornedo, and the Municipality. Their complaint, filed under 42 U.S.C. § 1983 and related provisions of Puerto Rico law, alleged as to every plaintiff that (1) the three defendants had terminated them in violation of their due process rights, and (2) the terminations of their employment were based on political affiliation and were therefore also in violation of their First Amendment rights.

Jury trial commenced on October 1, 2003, and ended on November 10, 2003. At the close of plaintiffs' evidence, the defense moved for Fed. R. Civ. P. 50 judgment as a matter of law on all issues. The district court granted the motion as to Hernández' political discrimination claims against Norat and Hornedo, but

---

[12] The jury found for the defense as to these two plaintiffs, and they do not appeal. We do not discuss them further.

-18-

allowed her political discrimination claim to go forward against the Mayor. The court otherwise denied the motion, leaving the career plaintiffs' due process and political discrimination claims intact.

On November 7, 2003, at the close of testimony, defendants renewed their motion for judgment as a matter of law on the remaining issues -- Hernández' political discrimination claim against Mayor Román and the career plaintiffs' due process and political discrimination claims against all the defendants. They argued that Hernández had not proved that the Mayor even knew her political affiliation, and that her position was not filled for months after the non-renewal of her contract; thus, they argued, there was a failure of evidence as to political discrimination. As to the career plaintiffs, the defense argued that (1) Norat could not be held liable because there had been no evidence establishing that he had a say in the decision to terminate the sanitation workers, and (2) all defendants could not be held liable because the privatization decision stemmed from public health concerns, not political discrimination, and because the Mayor relied on legal advice in deciding what shape privatization should take. The district court denied the motion in full.

On November 10, 2003, the jury returned its verdicts. As to Hernández, the jury found Román liable and assessed compensatory damages of $28,400 and punitive damages of $3,000. As to the

thirty-six career plaintiffs, the jury found both Román and Norat (but not Hornedo) liable. It assessed compensatory damages against Román and Norat in amounts ranging from $18,537 to $33,200 per career plaintiff; the total was $887,097. It also assessed punitive damages against Román only, in the amount of $3,000 per career plaintiff, for a total of $108,000. The verdict form the jury was given did not ask it to indicate whether it was finding for plaintiffs on due process grounds, First Amendment grounds, or both.

On November 14, 2003, the district court entered judgment against Mayor Román and Norat in the amounts the jury had awarded.[13] It also ordered the career plaintiffs reinstated to career positions at the Municipality, with the "same salaries, benefits, seniority, and equivalent functions as they had before their illegal dismissal from employment." The defendants renewed their Rule 50 motion for judgment as a matter of law, submitted a Rule 59 motion requesting that the compensatory and punitive damages be remitted, and asked the district court to reconsider its reinstatement order. These motions were denied.

On appeal, Mayor Román and Norat bring several challenges. First, as to the thirty-six career plaintiffs, they

[13] While the Municipality itself was initially a defendant in this case, it was not listed as such on the verdict form, the jury made no finding against the Municipality per se, and the district court entered judgment only against the Mayor and Norat.

-20-

argue that (1) plaintiffs never demonstrated on the evidence a prima facie causal connection between their political affiliation and the termination of their employment; (2) the defense evidence compelled a finding that there was a legitimate, non-discriminatory reason for the privatization; and (3) even if some political animus had been present, defendants still should prevail because the evidence showed that such animus was not the but-for cause of the privatization. They also argue that both Mayor Román and Norat are entitled to qualified immunity. As to remedy, they argue that even if there were liability here, the district court's reinstatement order was inappropriate; that compensatory damages should be remitted because of plaintiffs' failure to mitigate; and that punitive damages were unavailable on these facts as a matter of law.

As to Hernández, Mayor Román argues that she cannot sustain a First Amendment claim because there was no evidence of political animus as a cause of the non-renewal of her contract, and because Hernández' contract would not have been renewed in any event since she was not qualified for her Social Worker position. He also argues that Hernández' damages should have been remitted.

Plaintiffs argue first that defendants have waived most of their challenge because they failed to argue on appeal the issue of due process violation of the career plaintiffs' rights. They argue that since the jury issued an undifferentiated verdict that

could have rested on due process grounds, plaintiffs' silence effectively concedes due process liability and ends the case. Alternatively, they argue that all of defendants' assignments of error as to qualified immunity, the finding of liability, the amount of damages, and the reinstatement order are meritless.

Given the nature of the evidence and the remedies, we prefer to rest our holdings on First Amendment grounds and do not reach the due process question.

**III.**

A.      Legal Standards

We review de novo the district court's denial of judgment as a matter of law.  The verdict must be upheld "unless the facts and inferences, viewed in the light most favorable to the verdict, 'point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have [returned the verdict].'" Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993) (alteration in original) (quoting Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 214 (1st Cir. 1991)).

"Even though we draw all rational inferences from the facts in favor of plaintiff, 'the plaintiff is not entitled to inferences based on speculation and conjecture.'" Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 29-30 (1st Cir. 2004) (quoting Ferrer v. Zayas, 914 F.2d 309, 311 (1st Cir. 1990)).  The party who bears the burden of proof "must have presented 'more than a mere

scintilla of evidence in its favor' to withstand a motion for judgment as a matter of law." Id. at 30 (quoting Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 76 (1st Cir. 2001)).

As to the substantive law, the burden was on plaintiffs to show discrimination based on political affiliation. Governmental employees who are not in policy-making positions of confidence are shielded from adverse employment decisions based on their political affiliations. Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 7 (1st Cir. 2000); see also Rutan v. Republican Party of Ill., 497 U.S. 62, 64, 75, 79 (1990) (political discrimination claims may extend to hiring, promotions, transfers, and recalls after layoffs); Branti v. Finkel, 445 U.S. 507, 517-19 (1980); Elrod v. Burns, 427 U.S. 347, 356 (1976) (stating that freedoms of "political belief and association constitute the core of those activities protected by the First Amendment"). Plaintiffs who bring political discrimination claims bear the burden of "producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that plaintiffs' constitutionally protected conduct . . . was a 'substantial' or 'motivating' factor behind their dismissal." Acevedo-Diaz, 1 F.3d at 66. "Defendants then carry the burden to establish . . . a nondiscriminatory reason for the challenged action . . . ." Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 131 (1st Cir. 2005); see also Vázquez-Valentín, 385

F.3d at 30 ("The defendant, of course, may offer rebuttal evidence to attempt to disprove that political affiliation played a substantial role in the adverse employment action.").

There is a separate but related defense under the Mt. Healthy doctrine, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977):

> [E]ven if a plaintiff can demonstrate that her political affiliation was a substantial factor in the adverse employment action taken against her, there is no constitutional violation if the defendant can show both (i) that it would have taken the same action in any event, and (ii) that it would have taken that action for reasons that are not unconstitutional.

Sanchez-Lopez, 375 F.3d at 124 (citing Mt. Healthy, 429 U.S. at 286-87). This affirmative defense ensures that a constitutional violation will only be found where "political discrimination was the ultimate 'but for' cause of an adverse employment action." Id. at 125. This is appropriate because, "[a]s the Supreme Court noted, to adopt a view of causation that focuses solely on whether protected conduct played a part in an employment decision . . . would put an 'employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied [otherwise].'" Id. at 131 (second alteration in original) (quoting Mt. Healthy, 429 U.S. at 285).

The Mt. Healthy defense, then, is particularly important in these cases where a new administration reorganizes government in ways which particularly disadvantage incumbent employees who belong

-24-

to the party formerly in power.  These incumbent employees have no right to thwart the will of the voters that a new regime make changes, if the new regime would have made those changes even in the absence of any prohibited discrimination.

B.        Political Discrimination and the Career Plaintiffs

          The defendants argue that no reasonable juror could have found political discrimination on these facts.  They point to the testimony of Román and Norat that the sanitation division was privatized because of public health and quality-of-service concerns, and that political affiliation played no role in their decisions.  This, they argue, constitutes (1) evidence showing lack of discriminatory animus, (2) evidence of a non-discriminatory reason for the privatization, and (3) evidence sufficient to show, under Mt. Healthy, that political discrimination was not the "but-for" cause of the decision to eliminate career plaintiffs' jobs.

          Defendants make two additional arguments.  First, they point to the testimony that a system was in place to ensure that the fired employees were rehired, either by ARB or by the Municipality; they suggest this compels a conclusion that no discrimination was intended. Second, they argue that the municipal ordinance authorizing privatization, and Román's testimony that he followed the advice of his human resources director and an attorney in devising the privatization process, show that both the decision

to privatize, and the decision to privatize in a way that cost the career plaintiffs their jobs, were free of discriminatory intent.

In our view, the case does not turn on the legitimacy of a decision by a Municipality to privatize its sanitation division. To be sure, the evidence presented some reasons to doubt such legitimacy: the Mayor had expressed a desire to rid the Department of Public Works of NPP members, and to fill the jobs with PDP members, and he could not do so within the current structure, given that the sanitation workers were protected as career employees under Puerto Rico law. Further, there is some evidence that the new regime deliberately made matters worse in order to provoke a sanitation crisis which would justify a decision to privatize. Still, this might well be too fragile an underpinning to justify federal intervention in a decision to privatize.

### 1. Mayor Román

The verdict against Mayor Román, however, is easily supported by the manner in which his administration implemented the decision to privatize. A jury could readily conclude that the Román administration implemented privatization in a manner designed to discriminate. The administration did so, or so a jury could find, in violation of multiple separate requirements of local law: (1) two provisions of the municipal privatization ordinance, (2) the previously adopted Layoff Plan, and (3) the procedural rights of career employees. The municipal ordinance did not authorize

Román to terminate the career plaintiffs' employment. Instead, it required that the private sanitation firm consider the municipal sanitation workers for jobs, and that sanitation workers who did not take jobs with the private firm be "retained in their positions or . . . relocated to other dependencies of the municipality." The ordinance also stated that the Municipality agreed "to protect and guarantee the vested rights" of the career plaintiffs. The privatization system Román and Norat actually implemented did neither of these things. As to the 1997 Layoff Plan, González testified that it applied to privatizations and that she advised the Mayor to follow the law, and Mayor Román himself conceded that if the Layoff Plan applied, transitory workers had to be laid off before any career employee. The jury could easily conclude that political motivation was a substantial reason and, indeed, the but-for reason for the decisions not to follow these laws.

In addition, there were explicit statements by Mayor Román of an intent to discriminate. González testified that the Mayor said that "with this privatization process, they were going to be able to get rid of employees that were not belonging to the political party of the people in power." She also testified that Román said the Layoff Plan was ignored because it would have been an obstacle to firing NPP workers. Others testified that the Mayor went so far as to instruct ARB officials not to offer the fired workers jobs in San Lorenzo.

-27-

Further, the Mayor took the stand, and on important questions where his testimony was flatly contradicted by other witnesses, the jury could easily have concluded his testimony was not credible. Mayor Román testified that discrimination played no role in the privatization decision. But the jury also heard testimony that Román believed (correctly) that the sanitation division was a nest of NPP-affiliated workers, and that discrimination did play a role in the decision to privatize.

Mayor Román also testified that he shaped the privatization plan in reliance on advice from his human resources director and attorney. Here, too, a reasonable jury could conclude that Mayor Román's testimony was deliberately untrue: his human resources director, González, testified both that she did not in fact give Mayor Román such advice and that Mayor Román structured the privatization plan the way he did specifically so he could fire NPP-affiliated workers. The defendants also failed to call as a witness the attorney on whose legal advice the Mayor purportedly relied.

The defendants also testified that they intended to ensure the career plaintiffs jobs at ARB and rehire them at the Municipality if necessary. However, a reasonable jury easily could have concluded that this too was a lie, and that no such system was in place. Most of the career plaintiffs never acquired jobs at ARB or the Municipality, even when they sought them out. Some were

explicitly told that Román had ordered that they not be rehired. And those who did receive employment offers were confronted with jobs vastly inferior, either in terms of benefits (transitory employment) or working conditions (private-sector positions with long commutes and questionable job security), to those they had previously held.

Furthermore, the jury heard specific and detailed testimony that most, if not all, of the municipal workers hired since the privatization were PDP-affiliated, and that some of those new PDP workers performed jobs that the fired sanitation workers had done, just under the guise of different job titles. This, in combination with the evidence described above, is more than sufficient. See Acevedo-Garcia v. Monroig, 351 F.3d 547, 565-66 (1st Cir. 2003).

2.    Engineer Norat

On the evidence, the jury could well have concluded that Norat was not liable because he did not agree with or intend to participate in the discrimination effectuated by the Mayor, but did so only under compulsion. However, the jury did not exonerate Norat, and evidence supports its conclusion.

Borges testified that Norat was present when Mayor Román spoke of his desire to fire the NPP employees in the Public Works Department. Norat was deeply involved with the privatization; he took it to the Municipal Assembly and he told the career plaintiffs

-29-

to stay home and take compensatory time after January 25. Defendants characterize the privatization decision as one made by both men together: "Mayor Román and Norat made a difficult administrative decision, after a thorough analysis, to privatize the sanitation services." Importantly, there is evidence that Norat was not just carrying out Mayor Román's decision, but in fact harbored political animus himself. Asked how he knew that the Mayor's desire to fire public works employees was politically motivated, Borges replied: "Because they would tell me, the engineer would tell me, Mr. Martin Davila would tell me, that they wanted to get rid of the NPP employees in order to place Popular Democratic Party followers." The engineer was obviously Norat, or so a jury could find. Further, it was Norat who encouraged NPP members elsewhere in the department to transfer to sanitation before there was any public discussion of privatizing the division; these NPP members subsequently lost their jobs upon privatization.

On this evidence, a reasonable jury could have concluded that Norat helped Mayor Román devise the plan to privatize the sanitation division in such a way as to remove the career plaintiffs from their jobs, and would not have done so but for plaintiffs' NPP affiliations.

C.      Political Discrimination and Plaintiff Hernández

"[T]he fact that a transitory employee does not have a reasonable expectation of renewal in his or her employment . . .

does not defeat a First Amendment claim." Gomez v. Rivera Rodriguez, 344 F.3d 103, 111 n.5 (1st Cir. 2003) (internal quotation marks omitted) (omission in original) (quoting Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 98 (1st Cir. 1997)).

Our recitation of the evidence quickly disposes of the Mayor's arguments that Hernández "failed to demonstrate that Mayor Román knew her, knew her political affiliation or used that information as a factor in not renewing her transitory contract." Mayor Román argues that the evidence established a non-discriminatory reason for the termination of Hernández -- that the department lacked funds for her position. But there was testimony this was not true, and her PDP replacement was hired only five months later. And the Mayor's argument that Hernández was not qualified for her Social Worker position could easily have been understood by the jury to be a pretext. She had been continually rehired and had received excellent ratings.

Mayor Román's final argument on this issue is that Hernández failed to timely reapply after receiving her dismissal letter. The evidence on this point actually works to Mayor Román's disadvantage: Hernández testified that the Municipality was supposed to summon her to compete for her old job before it was again filled, and that it did not do so.

## IV.

We review the district court's denial of qualified immunity de novo, Whitfield, 431 F.3d at 6, construing the evidence "in the light most hospitable to the party that prevailed at trial," and according deference to "the jury's discernible resolution of disputed factual issues," id. (internal quotation marks omitted) (quoting Jarrett v. Town of Yarmouth, 331 F.3d 140, 147 (1st Cir. 2003)).

Qualified immunity "provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties." Id.; cf. Anderson v. Creighton, 483 U.S. 635, 638 (1987). Public officials are "entitled to qualified immunity unless the facts establish that their conduct violated a constitutional right that was 'clearly established' at the time of the violation such that a reasonable officer would have known that the conduct at issue was unlawful." Whitfield, 431 F.3d at 6 (emphasis in original) (quoting Santana v. Calderón, 342 F.3d 18, 23 (1st Cir. 2003)).

This circuit usually evaluates qualified immunity claims under a three-part test. See, e.g., Torres-Rivera v. Calderón-Serra, 412 F.3d 205, 214 (1st Cir. 2005); Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60-61 (1st Cir. 2004). First, we ask whether, "[t]aken in the light most favorable to the party

-32-

asserting the injury, . . . the facts . . . show the officer's conduct violated a constitutional right." Riverdale Mills, 392 F.3d at 61 (internal quotation marks omitted) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). If so, the second question is "whether that constitutional right was clearly established at the time of the . . . violation." Whitfield, 431 F.3d at 7. The third question is "whether a reasonable officer, similarly situated, would understand that the challenged conduct violated the clearly established right at issue." Riverdale Mills, 392 F.3d at 61 (internal quotation marks omitted) (quoting Suboh v. Dist. Attorney's Office, 298 F.3d 81, 90 (1st Cir. 2002)). The Supreme Court has instructed us, generally, to analyze the first prong first, even if the outcome of one of the other prongs might end the inquiry. Saucier, 533 U.S. at 201.

The district court's denial of immunity is easily affirmed. A jury could readily find a violation of plaintiffs' rights. Defendants' second argument, that there was no clearly established right in the career plaintiffs not to have their employment terminated due to their political affiliation, is frivolous.[14] Acevedo-Garcia, 351 F.3d at 564; Angulo-Alvarez, 170 F.3d at 249-50. As to the third prong of the test, defendants

_____

[14] Mayor Román offers no developed argument as to qualified immunity with regard to contract plaintiff Hernández, and in fact the doctrine is not even mentioned in the portion of defendants' brief devoted to Hernández. Any such challenge is waived. See Acevedo-Garcia, 351 F.3d at 560-61.

-33-

argue that the Mayor relied on advice from counsel and from González, the human resources director. But a jury easily could have found that this was not so, and that Mayor Román was explicitly warned he should not engage in this scheme in violation of the rights of these employees. The evidence shows that the Mayor and Norat intended exactly to terminate these employees based on their political affiliation and did their best to cover their tracks.

## V.

Defendants next challenge, on several grounds, the district court's order reinstating the career employees. Our review is for abuse of discretion. Hiraldo-Cancel v. Aponte, 925 F.2d 10, 13 (1st Cir. 1991); Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 323 (1st Cir. 1989) (en banc). We accord the order considerable deference, as the district court "has had first-hand exposure to the litigants and the evidence . . . [and] is in a considerably better position to bring the scales into balance than an appellate tribunal." Rosario-Torres, 889 F.2d at 323.

Two initial arguments are meritless. First, defendants argue that because the career plaintiffs declined to take their complaint to the Board of Appeals of the Personnel Administration System (known as JASAP) within thirty days, the municipal personnel decision became unappealable. This is clearly incorrect: state employees asserting claims such as these are not required to

-34-

exhaust administrative remedies before bringing a § 1983 action in federal court. <u>Baez-Cruz</u> v. <u>Municipality of Comerio</u>, 140 F.3d 24, 30 (1st Cir. 1998) (citing <u>Patsy</u> v. <u>Board of Regents</u>, 457 U.S. 496, 515 (1982)). Second, defendants argue that because of the career plaintiffs' failure to go through JASAP, "the doctrine of issue preclusion bars the District Court from ordering reinstatement." This argument makes no sense. Where there has been no hearing, and therefore no findings, there can be no issue preclusion.

Defendants' final argument is that the factors this court has deemed relevant to the reinstatement question cut against reinstating the career plaintiffs, and so the district court abused its discretion. They admit that the career plaintiffs "in great part did not find gainful employment after the layoff." However, they argue that reinstatement was still inappropriate because, <u>inter alia</u>, (1) most of the career plaintiffs' old jobs were eliminated in the privatization, (2) the antagonism between the parties would create a poor work environment, (3) the career plaintiffs "were compensated more than adequately" for the loss of their jobs, and (4) the career plaintiffs did not have "clean hands" because many did not complete the process of applying to work for ARB or reapplying for work at the Municipality.

In the political discrimination context, a violation of First Amendment rights does not lead <u>a</u> <u>fortiori</u> to reinstatement. <u>Velazquez</u> v. <u>Figueroa-Gomez</u>, 996 F.2d 425, 428 (1st Cir. 1993). On

the other hand,"[w]henever an ex-employee sues alleging wrongful dismissal by a government agency, job restoration may be a material aspect of meaningful relief." Rosario-Torres, 889 F.2d at 322. "[R]outinely incidental burdens" of reinstatement -- for example, tension in the workplace, or displacement of employees who had taken on duties previously handled by the fired workers -- "are foreseeable sequelae of defendant's wrongdoing, and usually insufficient, without more, to tip the scales against reinstatement when first amendment rights are at stake in a section 1983 action." Id. (internal quotation marks omitted). Among the factors relevant to the reinstatement analysis are the following: "(1) the strength of the evidence proving the first amendment violation; (2) whether the discharged employee has found comparable work; [and] (3) the absence of a property right in the position because the employee was hired in violation of local law." Velazquez, 996 F.2d at 429.

There was no abuse of discretion in ordering reinstatement here. Plaintiffs presented strong evidence of a First Amendment violation, and many of the career plaintiffs have not found work in the aftermath. The possibility of workplace antagonism, and the upheaval that will be caused by finding jobs for the fired workers, are the "foreseeable sequelae of defendant[s'] wrongdoing," Rosario-Torres, 889 F.2d at 322. Nor do the damage awards obviate the need for reinstatement. See Hiraldo-Cancel, 925 F.2d at 13 (noting that often, "[w]hen a person

loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole," because "[t]he psychological benefits of work . . . are real and cannot be ignored") (first alteration in original) (internal quotation marks omitted) (quoting Allen v. Autauga County Bd. of Educ., 685 F.2d 1302, 1306 (11th Cir. 1982)).  Defendants' last argument, that the career plaintiffs do not have "clean hands," is without merit.  On the evidence at trial, those plaintiffs who did not apply for jobs had good reason for their decisions both as to ARB, where working conditions were poor, and as to the Municipality, where they had every reason to believe they were unwelcome.

**VI.**

Finally, the defendants appeal from the district court's refusal to remit the various damage awards.  We take the two types of damages in turn.

A.        Compensatory Damages

"Where defendants properly preserve a challenge to the amount of compensatory damages awarded by the jury, 'our inquiry is limited to determining whether the trial court abused its discretion in refusing to set aside the verdict as excessive,'" Acevedo-Garcia, 351 F.3d at 566 (quoting Anthony v. G.M.D. Airline Servs., Inc., 17 F.3d 490, 493 (1st Cir. 1994)), and "the evidence is viewed in the light most favorable to the prevailing party," Velazquez, 996 F.2d at 428.  These deferential standards recognize

-37-

that "[t]ranslating legal damage into money damages -- especially in cases which involve few significant items of measurable economic loss -- is a matter peculiarly within a jury's ken." Id. (alteration in original) (internal quotation marks omitted) (quoting Wagenmann v. Adams, 829 F.2d 196, 215 (1st Cir. 1987)). "Therefore, unless we can say that the award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand, we will not overrule a trial judge's considered refusal to tamper with the damages assessed by a jury." Id. (internal citations and quotation marks omitted) (quoting Segal v. Gilbert Color Sys., Inc., 746 F.2d 78, 80-81 (1st Cir. 1984); Ruiz v. Gonzalez-Caraballo, 929 F.2d 31, 34 (1st Cir. 1991)).

Defendants argue that the compensatory damages should be reduced because the career plaintiffs failed to mitigate their losses: they say the career plaintiffs were guaranteed jobs with ARB or the Municipality but many frittered away that guarantee by failing to apply for jobs and, in cases where municipal reemployment was sought and offered, turning it down.

The compensatory damages awarded by the jury were rationally related to the career plaintiffs' economic loss as well as to their impairment of reputation, their mental anguish, and their suffering, all standard components of compensatory damages in § 1983 actions. Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S.

299, 307 (1986). As to economic loss, many of the plaintiffs were without their jobs and associated benefits for a substantial period of time -- from at least February 2002 through November 2003, when the district court ordered them reinstated -- and while their salaries varied, most earned between $800 and $1,000 per month. As to other damages, the career plaintiffs testified they were humiliated and stunned by the loss of their "career" jobs.

As for defendants' mitigation argument: When there was evidence the Mayor instructed ARB and municipal officials not to hire the laid-off employees in San Lorenzo, he is ill-situated to argue that the employees should have, despite the demonstrated futility of requesting jobs, made the requests anyway.

As to Hernández, she was awarded $28,400. Had her contract been renewed, she likely would have earned about $1,120 per month, her previous salary. She went without that salary during some periods after her dismissal when she was unemployed, and though she was working in a transitory job in another municipality at the time of trial, she testified that she was ineligible for medical benefits and that her benefits were otherwise inferior to what she had enjoyed at San Lorenzo. Further, she testified that the non-renewal of her contract caused her emotional suffering.

Defendants argue that Hernández failed to mitigate her damages when she did not pursue municipal reemployment. But there

was evidence that defendants did not contact her to reapply for her job when it was filled, as they were supposed to. They cannot now complain about her failure to reapply.

B.        Punitive Damages

The review of a preserved challenge to a punitive damages award is de novo, and the "award will stand unless we find it 'certain' that the amount in question exceeds that necessary to punish and deter the alleged misconduct." Románo v. U-Haul Int'l, 233 F.3d 655, 672 (1st Cir. 2000) (quoting Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 14 n. 11 (1st Cir. 1999)). In a § 1983 action, there is also a legal threshold. The Supreme Court has said a jury may award punitive damages where the defendant's behavior is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). In the context of intentional discrimination, the Court has explained that a defendant must act "in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999);[15] see also Iacobucci v. Boulter, 193 F.3d 14, 26 (1st Cir. 1999) (describing Kolstad and Smith as requiring knowing violation

---

[15]    Kolstad examined the punitive damages provision found in 42 U.S.C. § 1981a(b)(1), but its analysis is applicable to § 1983 punitive damages.  Iacobucci v. Boulter, 193 F.3d 14, 26 n.7 (1st Cir. 1999).

or "conscious indifference" to the risk of violating a plaintiff's federally protected rights).

This does not need extended discussion. On the basis of the testimony already described, a jury was warranted in finding that Mayor Román acted with intent to violate federal law, or at the very least in the face of a perceived risk that his actions were in violation of federal law. Finally, we cannot say it is "certain" that an award of $3,000 per plaintiff "exceeds [the amount] necessary to punish and deter the alleged misconduct." Románo, 233 F.3d at 672.

**VII.**

The jury verdict is affirmed in all respects, as are the district court's denial of qualified immunity and order of reinstatement. Costs are awarded to plaintiffs. So ordered.